Harvey Brown, Justice
Historically, when a patient sought a medical evaluation, the patient could have expected to be billed a physician's fee in addition to the cost of any tests, treatments, and medicines provided during the medical visit. And when the medical evaluation was provided by a physician in a hospital's emergency room, the patient also could have expected to be billed a "facility fee." Facility fees have been described as premium add-ons meant to offset both the higher costs associated with maintaining, staffing, and stocking an emergency-ready facility 24 hours per day and the inherent financial losses incurred while treating people who have emergency medical needs but no ability to pay.[1]
Certain facilities are statutorily allowed to charge facility fees. As examples, licensed hospitals with attached emergency rooms and licensed, freestanding emergency *328 centers are entitled to recover facility fees in connection with medical care provided at their facilities.[2]
This appeal arises from a suit by insuring entities to recoup facility fees. The plaintiffs, United Healthcare Services, Inc., United Healthcare Insurance Company, United Healthcare Benefits of Texas, Inc., and United Healthcare of Texas, Inc. (collectively "United"), contend that they were defrauded into paying facility fees to entities not entitled to receive them. United pleaded that a licensed hospital and its related entities and owners (collectively "First Hospital")[3] conspired with various freestanding emergency centers and their related entities and owners (collectively "Off-site ERs")[4] to use First Hospital's license to charge facility fees in connection with care provided at the Off-site ERs. United also sued Diane Crumley and her related entities (collectively "Crumley"),[5] alleging that she introduced First Hospital to the Off-site ERs and coordinated the fraudulent scheme between them.
The defendants, First Hospital, the Off-site ERs, and Crumley, offer two arguments that the fees were properly recoverable: first, that the Insurance Code defines "emergency care" to include health care services at a "comparable emergency facility,"[6] which the Off-site ERs claim to be; and second, that a January 2008 Department of Insurance letter cited by insurers/payors to avoid paying facility fees to freestanding emergency centers has no legal effect because it did not result from a public notice-and-comment period.
The defendants sought summary dismissal of United's suit under various theories. They moved for summary judgment on statute of limitations, no evidence, federal preemption, and other grounds. Only one of United's claims survived summary judgment. United nonsuited that claim and appealed.
In three issues, United contends that the trial court erred by granting summary *329 judgment, including on limitations and federal preemption grounds. The defendants raise several cross-appellate issues as well.
Because the statutes of limitations bar United's claims, we affirm without reaching the cross-appellate issues.
Background
Pre-2009 - Emergence of Unlicensed Off-site ERs
Emergency rooms traditionally have been physically attached to hospitals, which are licensed by the state. These emergency facilities have a long history of charging insurers, or any entity or individual paying medical expenses, a facility fee, which often ranges from a couple hundred dollars to over $1,000 per claim.[7] The charged facility fee is in addition to the physician fee and the cost of any tests, treatments, and medicines.
Freestanding emergency centers are a relatively new addition to emergency medicine. They first became common about a decade ago, and for the first several years after their emergence, there was no requirement that they obtain a state license. Some were owned by hospitals, while others were owned by physicians, physician groups, or investors. From the beginning, there was an issue whether these unlicensed, freestanding emergency centers could collect facility fees.
In 2006, the Texas Department of Insurance issued a letter to Aetna Life Insurance Company stating that insurers "are required to pay for out-of-network emergency care services" provided at these freestanding emergency centers but "are not required to pay facility charges billed by freestanding emergency centers that do not have a license from the Department of State Health Services."
Consistent with this letter, in 2008, United wrote four letters to one of the Off-site ERs in this suit-St. Michael-to deny facility-fees claims because St. Michael was an unlicensed freestanding emergency center. The last in the series of United's letters stated, "While it may be true that [St. Michael] is not required to be licensed in Texas, it is equally true that United is not required to reimburse an unlicensed entity" for facility fees.
2009 - State licenses become mandatory and the Off-site ERs enter into agreements for First Hospital to manage their individual locations
In June 2009, the Legislature enacted Health and Safety Code section 254.051, which requires Off-site ERs to be licensed by the State. See TEX. HEALTH & SAFETY CODE § 254.051 (eff. Sept. 1, 2009). The statute provides certain exemptions from the licensing requirement, including for facilities that satisfy two requirements: (1) they are "owned or operated" by a licensed hospital and (2) they have been "granted provider-based status" by the federal Centers for Medicare and Medicaid Services, which is part of the Division of Financial Management and Fee for Services Operations within the Department of Health and Human Services ("DHHS"). Id. § 254.052(8) (emphasis added).
After this dual-requirement statute was enacted, St. Michael entered into a "Facilities Management Services Agreement" with First Hospital that authorized St. Michael to bill insurers a facility fee "in Hospital's name" for the medical services St. Michael provided. Under the agreement, St. Michael continued to "own the *330 facilities" and be responsible for selecting, training, supervising, and terminating the facility staff; designating and paying the staff's salaries; and paying all related personnel-management expenses. First Hospital's contractual role was to manage the facility, for which it would be paid a "management" or "hospital" fee equal to 12% of the accounts receivable. St. Michael would keep the remaining 88% of the accounts receivable. Other Off-site ERs entered into similar management agreements with First Hospital.
St. Michael and other Off-site ERs also petitioned for provider-based status from the Centers for Medicare and Medicaid Services, which was granted.
Over the next couple years, the Off-site ERs submitted millions of dollars in facility-fee charges to United and other insurers in connection with medical services provided at the Off-site ERs and billed under First Hospital's name, license, and tax identification number.
2010 - Under new affiliation agreements, First Hospital leases the Off-site ER locations from their individual owners and the owners become "managers"
In June 2010, the Off-site ERs entered into a different type of affiliation agreement with First Hospital, called an "Emergency Room Department Management Agreement."[8] The 2010 agreements reversed the roles, making First Hospital a lessee of the emergency centers and the Off-site ERs the managers. The Off-site ERs would provide "administrative and management services" to First Hospital's "hospital-based off-campus emergency room departments." The "manager" Off-site ERs would be contractually required to "bill and collect all facility and other applicable fees for all reimbursable emergency health care services provided at the" Off-site ERs and to submit the claims "under the Hospital's billing number." Like the earlier agreements, First Hospital would keep 12% of revenues and the Off-site ERs would keep the remaining 88%. The Off-site ERs continued to bill United for facility fees under First Hospital's name, license, and tax identification number in connection with the provided medical services.
In July 2010, United requested that First Hospital provide it a "facility location roster" that identified its associated community emergency rooms. United also asked that First Hospital state for each location "how the business relationship is constructed" so that United "may better understand how these entities are related to [First Hospital]." First Hospital responded with a letter that listed seven locations as "simply off-site departments of the Hospital" that were "wholly-owned"[9] by First Hospital. The list of "departments" included St. Michael and Memorial Heights.[10]
March 2011 - United seeks reimbursement from St. Michael for $1.8 million in overpayments
In March 2011, United wrote to St. Michael demanding reimbursement of $1.8 *331 million in overpayments. United contended that St. Michael was not entitled to collect its billed fees because the 2006 Department of Insurance letter limited fees to "hospital based services" and St. Michael was an unlicensed freestanding facility that was not comparable to a hospital-based facility. United's letter indicated that a detailed description of the claims being challenged and the method used to calculate the overpayments was attached. Those supporting documents are not in the record.
April 2011 - Another insurer sues First Hospital and St. Michael, alleging fraudulent billing
In April 2011, another insurer, Aetna Life Insurance Company, sued First Hospital and St. Michael in federal court.[11] Aetna alleged that St. Michael was a "freestanding center," not a licensed hospital-based emergency room and, as such, had no legal right to recover facility fees in connection with medical care provided at its facility. According to Aetna, St. Michael nevertheless began billing for facility fees in 2007 under its own name and tax identification number. Aetna denied the facility-fee charges and did not pay them. Then, in August 2009, according to the complaint, St. Michael began to submit facility-fee claims under First Hospital's name and tax identification number through a "sham affiliation agreement" entered to "defraud Aetna." Aetna asserted that St. Michael had "masqueraded as a hospital emergency room" to collect the unowed facility fees.
Aetna alleged that it had "repeatedly requested a copy of the affiliation agreement from" First Hospital and St. Michael. But, according to Aetna, First Hospital and St. Michael refused to produce their affiliation agreements because their affiliation was a sham. Aetna asserted multiple causes of action against First Hospital and St. Michael, including fraud, negligent misrepresentation, unjust enrichment, and money had and received. It also pleaded civil conspiracy and sought exemplary damages and other remedies.
First Hospital and St. Michael denied Aetna's claims. St. Michael contended that, before 2010, it had properly submitted claims for facility fees in its own name because it qualified as a "comparable facility" and, thus, was entitled to facility fees. St. Michael denied that the 2006 Department of Insurance letter had any "authority or weight of law" because it was prepared without public notice, comment period, or publication in the Texas Register.
St. Michael pleaded that its status materially changed when it entered into the Emergency Room Department Management Agreement because it "became a fully-integrated off-campus emergency department of" First Hospital. St. Michael asserted that its affiliation with First Hospital permitted it to recover facility fees submitted under First Hospital's name, license, and tax identification number. St. Michael specifically denied that the affiliation was intended to deceive Aetna into paying facility fees.
First Hospital filed an answer similarly denying Aetna's claims.
June 2011 - United learns of Aetna's suit
United first learned of the Aetna suit on June 2, 2011. In its discovery responses in this case, United confirmed:
*332 On or about June 2, 2011, United became aware of a federal court complaint that Aetna Life Insurance Company filed against First Street and other defendants in this case. Specifically, United learned that Aetna had sued First Street Hospital and St. Michael's through Louise Dobbe, Senior Associate General Counsel for United, who learned of the lawsuit after reading about it on an online health news blog. After reading about the Aetna lawsuit, Ms. Dobbe downloaded a copy of Aetna's federal court complaint against First Street and St. Michael's from PACER, and saved it to her files on June 2, 2011.
Based on its review of Aetna's complaint in June 2011, United knew that Aetna was alleging that First Hospital had contracted with at least one of the Off-site ERs with the intention of hiding non-compliance with Health and Safety Code section 254.052 and of receiving facility fees that may not be owed.[12]
December 2011 - United begins investigating First Hospital and the Off-site ERs
Six months after learning of the Aetna suit, on December 14, 2011, United hired a law firm to "inquire into the relationship" between First Hospital and the Off-site ERs. The appellate record is silent as to United's and its counsel's actions over the next couple years regarding the investigation and any information uncovered. The next indication of activity, according to this record, is in May 2014.
2014 - Communications between United and First Hospital about First Hospital's contractual relationship with the Off-site ERs
On May 23, 2014, United's counsel wrote to First Hospital, noting that the Texas Health and Safety Code requires a license *333 for freestanding emergency-medical-care facilities unless they satisfy the dual requirements for statutory exemption. Those requirements are that the facility be (1) "owned or operated by a [licensed] hospital" and (2) "granted provider-based status" by DHHS. See TEX. HEALTH & SAFETY CODE § 254.052(8). United referenced First Hospital's July 15, 2010 letter, in which First Hospital had referred to the Off-site ERs as its "wholly-owned" provider-based entities and requested "additional information to support the representations so United can evaluate whether First [Hospital] and the off-site emergency departments are in compliance with the law." United specifically requested a copy of First Hospital's agreement with each of the Off-site ERs.
Over the next four months, the parties exchanged five additional communications, three of which are in the record. In the three letters, First Hospital informed United that, as of 2012, it no longer was affiliated with the Off-site ERs. First Hospital stated that, before 2012, "each location was organized in order to comply with the provider based entity requirements of 42 C.F.R. § 413.65, by being organizationally, clinically and financially integrated with the Hospital." But much like had allegedly occurred when Aetna requested details of the contractual relationships, First Hospital provided no details or documents for United's review. Instead, First Hospital provided various DHHS letters as evidence that DHHS had approved each location's provider-based entity status for payment of facility fees by government payors. Each DHHS letter related to only one of the Off-site ERs and stated that DHHS had reviewed documents submitted by First Hospital for that particular location and had determined that it "meets the requirements as a provider-based emergency department of First Street Hospital, in accordance with 42 CFR § 413.65."[13]
In its 2014 correspondence, First Hospital took the position that DHHS's approval "should satisfy" United's inquiry into whether First Hospital and the Off-site ERs met the provider-based entity requirements and could have collected facility fees. First Hospital further argued that the Texas two-fold requirement for exemption under Health and Safety Code section 254.052 were preempted by a DHHS determination of provider-based entity status because, as part of DHHS's evaluation, DHHS determined whether "off-campus facilities or organizations" operated "under the ownership and control of the main provider."[14] See 42 C.F.R. 413.65(e) (emphasis added).
Like Aetna before it, United made several requests to review First Hospital's contracts with the Off-site ERs, but First Hospital never supplied the agreements.
2015 - United files suit against First Hospital and the Off-site ERs
Around June 1, 2015-one day shy of four years after it learned of Aetna's suit-United contacted Aetna's litigation counsel. Nearly three months later, on August 28, 2015, United sued First Hospital, St. Michael, Memorial Heights, Woodlands FEC, and other Off-site ERs and their affiliated entities and owners, as well as Crumley, in state court. United's petition *334 closely mirrored Aetna's allegations and causes of action.[15]
2016 - Trial court grants summary judgment on limitations and other grounds
The trial court granted summary judgment against United on all claims except the money-had-and-received claim for payments made after August 28, 2013, which was two years before United filed suit. Other dispositive motions were also filed and granted against United, including on federal implied preemption grounds.
United nonsuited its only remaining claim-money had and received after August 28, 2013-because no facility fees were charged or paid after 2012, and it had no damages to pursue under that theory.
United appeals all the trial court's adverse rulings. Because the limitations issue is dispositive of all claims, we turn to it first.
Statute of Limitations
United sued First Hospital, the Off-site ERs, and Crumley on August 28, 2015, asserting various tort claims, including fraud, negligent misrepresentation, money had and received, unjust enrichment, and conspiracy. First Hospital, the Off-site ERs, and Crumley contend that the claims are barred by limitations, the longest of which is the four-year limitations period for the fraud claim. See TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4) ; Freeman v. Am. Motorists Ins. Co. , 53 S.W.3d 710, 712 (Tex. App.-Houston [1st Dist.] 2001, no pet.) ("The statute of limitations for a fraud action is four years after the day the cause of action accrues."). In response, United pleaded the discovery rule to toll limitations and sought damages for facility-fee claims it paid during the four pre-suit years.
A. Standard for review of summary-judgment motion on limitations when discovery rule is pleaded
When a defendant moves for summary judgment on the affirmative defense of limitations, it must conclusively establish the elements of that defense. Schlumberger Tech. Corp. v. Pasko , 544 S.W.3d 830, 833 (Tex. 2018) (citing KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp. , 988 S.W.2d 746, 748 (Tex. 1999) ). This requires conclusive proof of when the plaintiff's cause of action accrued. Id. at 834.
If the plaintiff has pleaded the discovery rule to toll limitations, the defendant seeking summary judgment must also negate the discovery rule as a matter of law. Pasko , 544 S.W.3d at 834 ; see Tex. Dep't of Protective & Regulatory Servs. v. Lynn , No. 03-04-00635-CV, 2005 WL 1991809, at *7 (Tex. App.-Austin Aug. 16, 2005, pet. denied) (mem. op.) (referring to discovery rule as counter-defense to limitations defense). The defendant may do so by establishing either that the discovery rule is inapplicable or that the summary-judgment evidence negates it, i.e., there is no genuine issue of material fact regarding when the plaintiff discovered or, in the exercise of reasonable diligence, should have discovered the nature of the plaintiff's injury and that the plaintiff failed to file suit within the applicable number of years from that date. See Pasko , 544 S.W.3d at 834 ; KPMG , 988 S.W.2d at 748 ; Weaver v. Witt , 561 S.W.2d 792, 793-94 (Tex. 1977).
*335 B. Accrual generally
The statute of limitations begins to run when a cause of action accrues. See TEX. CIV. PRAC. & REM. CODE § 16.003(a), 16.004(a). Whether a party's claim is timely depends on when it accrued and whether the party filed suit within the applicable number of years after the accrual date. See Freeman , 53 S.W.3d at 712.
Courts have used two general descriptions of when a cause of action accrues. First, the accrual date has been described as the date that the allegedly tortious act was committed and caused an injury. See Pasko , 544 S.W.3d at 834 ; Provident Life & Accident Ins. Co. v. Knott , 128 S.W.3d 211, 221 (Tex. 2003) ; Murray v. San Jacinto Agency Inc. , 800 S.W.2d 826, 828 (Tex. 1990). Second, accrual has been said to occur "when facts come into existence that authorize a party to seek a judicial remedy." Knott , 128 S.W.3d at 221. Under both formulations, a wrong must have occurred causing a legally cognizable injury. Absent some exceptions, injuries that arise or develop after a legal injury are deemed to have accrued on the same date as the legal injury that caused them. Pasko , 544 S.W.3d at 834 ; see S.V. v. R.V. , 933 S.W.2d 1, 4 (Tex. 1996). Thus, the accrual date is not dependent on whether "all resulting damages have ... occurred." S.V. , 933 S.W.2d at 4. "The fact that damage may continue to occur for an extended period ... does not prevent limitations from starting to run." Murray , 800 S.W.2d at 828. Nor is the accrual date impacted by whether the injuries are only slight or whether-again, absent an exception-"the fact of injury is not discovered until later." S.V. , 933 S.W.2d at 4 ; see Childs v. Haussecker , 974 S.W.2d 31, 41 n.7 (Tex. 1998).
C. Exception to general accrual rule: the discovery rule
In fraud cases, and in other limited contexts, the discovery rule delays accrual of the plaintiff's claim until the plaintiff knew or in the exercise of reasonable diligence should have known of the wrongful act and injury.[16] See Hooks , 457 S.W.3d at 57 ; see generally Via Net v. TIG Ins. Co. , 211 S.W.3d 310, 314 (Tex. 2006) (whether discovery rule applies "is decided on a categorical rather than case-specific basis; the focus is on whether a type of injury rather than a particular injury was discoverable").
*336 The discovery rule requires a defrauded party to "exercise reasonable diligence in discovering facts relating to its claims." Syrian Am. Oil Corp., S.A. v. Pecten Orient Co. , 524 S.W.3d 350, 360 (Tex. App.-Houston [1st Dist.] 2017, no pet.) ; see Little v. Smith , 943 S.W.2d 414, 420 (Tex. 1997) ("Generally, in a case of fraud the statute of limitations does not commence to run until the fraud is discovered or until it might have been discovered by the exercise of reasonable diligence.").
Courts use varying terminology to express and apply the discovery rule. At times, as with the cases cited above, the focus is on whether "reasonable diligence" would have discovered the fraud. See, e.g. , Syrian Am. Oil , 524 S.W.3d at 360. At other times, the question is whether the plaintiff had "constructive notice" of the fraud because pertinent information was "readily accessible and publicly available" but ignored. See, e.g. , Hooks , 457 S.W.3d at 59.
A third expression is in terms of "inquiry notice." See, e.g. , Seureau v. ExxonMobil Corp. , 274 S.W.3d 206, 228 (Tex. App.-Houston [14th Dist.] 2008, no pet.) (framing discover rule using "inquiry" standard); Hoover v. Gregory , 835 S.W.2d 668, 671 (Tex. App.-Dallas 1992, writ denied) (same). Under the inquiry-notice approach, "knowledge of facts that could cause a reasonably prudent person to make an inquiry that would lead to discovery of the cause of action is in the law equivalent to knowledge of the cause of action for limitations purposes." See Town of Dish v. Atmos Energy Corp. , 519 S.W.3d 605, 613 (Tex. 2017) (quoting with approval Mitchell Energy Corp. v. Bartlett , 958 S.W.2d 430, 436 (Tex. App.-Fort Worth 1997, pet. denied) ). Once a party is on inquiry notice of an alleged fraud, the limitations period begins. See Sandt v. Energy Maint. Servs. Grp. I, LLC , 534 S.W.3d 626, 642 (Tex. App.-Houston [1st Dist.] 2017, pet. denied) (concluding that nature of allegations in publicly available court filings put party on inquiry notice of allegations and obligated party to investigate); but see Sw. Energy Prod. Co. v. Berry-Helfand , 491 S.W.3d 699, 724 (Tex. 2016) (concluding that defendant did not conclusively establish when plaintiff should have discovered claim because defendant did not demonstrate that reasonably prudent person would have inquired further into misappropriation concerns, given that defendant had returned all data to plaintiff by alleged accrual date).
Regardless of parlance, the gist of the discovery rule is that, even if the plaintiff does not have actual knowledge of the fraud, the statute of limitations will begin to run once the plaintiff objectively should have known-by using reasonable diligence-of the "facts giving rise to its cause of action." Syrian Am. Oil , 524 S.W.3d at 360. "Thus, the plaintiff's lack of diligence can defeat application of the discovery rule." DeWolf v. Kohler , 452 S.W.3d 373, 391 (Tex. App.-Houston [14th Dist.] 2014, no pet.).
Reasonable diligence requires "sophisticated" parties in a business transaction to "acquaint themselves" with readily accessible, publicly available records. See Hooks , 457 S.W.3d at 57, 59. Court records are an example of publicly available records that may need to be reviewed by a sophisticated party. Hooks , 457 S.W.3d at 59.
The Texas Supreme court considered whether a sophisticated party was duly diligent in Via Net v. TIG Insurance Company , 211 S.W.3d 310 (Tex. 2006). Via Net's customer, Safety Lights, contracted to be added as an additional insured on Via Net's insurance policy. Id. at 312. Via Net's insurance broker issued a certificate *337 of insurance listing Safety Lights as "holder" and stating that "holder is added as additional insured re: General Liability." But the certificate also stated that it was "issued as a matter of information only and confer[red] no rights upon the certificate holder." Id. Via Net's insurance policy did not provide for additional-insured coverage, and no endorsement adding Safety Lights as an additional insured ever issued. Id. A few years later, a Via Net employee sued Safety Lights for personal injuries. Id. Safety Lights requested a defense. Id. The insurer denied the claim, and Safety Net sued Via Net for breach of contract.
The Texas Supreme Court concluded that Safety Net's breach-of-contract suit-filed almost four years after the insurer denied coverage-was time barred. The Court held that the discovery rule did not apply because Safety Lights had a duty to use due diligence to protect its interests and verify performance of the contract. Id. at 314. The Court explained that "due diligence may include asking a contract partner for information needed to verify contractual performance." Id. "If a contracting party responds to such a request with false information, accrual may be delayed for fraudulent concealment. But failing to even ask for such information is not due diligence." Id. at 314 (citation omitted).[17]
"Inquiries involving the discovery rule [and diligence] usually entail questions for the trier of fact." Childs , 974 S.W.2d at 44. But courts may, in some circumstances, "determine as a matter of law that reasonable diligence would have uncovered the wrong." Hooks , 457 S.W.3d at 58. So "when there is actual or constructive notice," such as when information is "readily accessible and publicly available," then, as a matter of law, the accrual of a fraud claim is not delayed. Id. at 59 (quoting Ross , 356 S.W.3d at 929 ); see Childs , 974 S.W.2d at 44 (stating that "commencement of the limitations period may be determined as a matter of law if reasonable minds could not differ about the conclusion to be drawn from the facts in the record").
D. Limitations expired before United filed suit
Fraud has a four-year limitations period. TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4). That is the longest limitations period of all United's tort claims. If United did not file suit within four years of the date its claims accrued-which, under the discovery rule, is the date United knew or in the exercise of reasonable diligence should have known of the wrongful act and injury-then all its tort claims would be barred by limitations. See Hooks , 457 S.W.3d at 57. We consider various dates that United's fraud claim may have accrued.
1. July 2010
First Hospital argues that the fraud claim accrued as early as July 2010 when First Hospital told United that it would be billing United as the service provider at the Off-site ERs; it described the Off-site ERs as "simply off-site departments of the Hospital" that were "wholly owned provide[r] based entities of the Hospital"; and it billed for services at those locations using its own tax identification number with payment due at its payment address.
*338 But First Hospital does not explain why this information caused United's fraud claim to accrue. First Hospital provides no evidence that, based on the limited information in its July 2010 communication, United knew or should have known that the information First Hospital conveyed might be untrue or that the relationship First Hospital described might be a sham to defraud United into paying facility fees that were not owed. See Little , 943 S.W.2d at 420 ("Generally, in a case of fraud the statute of limitations does not commence to run until the fraud is discovered or until it might have been discovered by the exercise of reasonable diligence.").
Mere knowledge that a contractual relationship with a third-party was claimed, without any indication that the disclosure's assertions were false or that an underlying scheme to defraud was allegedly underway, did not put United on notice of any wrongdoing and did not cause United's fraud claim to accrue.[18]
United's claim did not accrue in July 2010.
2. March 2011
United wrote to St. Michael in March 2011 to demand reimbursement of $1.8 million in overpayments. The parties take different positions regarding the significance of United's demand letter. United asserts that the demand letter addressed claims filed under St. Michael's tax identification number before St. Michael was affiliated with First Hospital, and thus is no evidence that United knew that St. Michael was charging unowed facility fees under First Hospital's name. United cites to the affidavit of Jacob Kearney-an employee of its affiliate-for support. But even if Kearney's interpretation is admissible-an issue not before us-he did not describe the demand letter in the manner asserted by United. His affidavit is silent on which entity-St. Michael or First Hospital-billed the disputed claims. It also is silent on the type of claims disputed. Kearney did aver, however, that "United Healthcare did not become aware of the agreements between First [ ] Hospital and the [Off-site ERs] until April-May 2015."
First Hospital and the Off-site ERs urge a different view. They describe the demand letter as requesting a refund for facility fees paid under First Hospital's tax identification number for St. Michael's benefit. If the letter reads as they suggest, it would indicate that United was aware of its potential injury more than four years before its August 2015 suit.
Because the supporting claims materials attached to United's March 2011 demand letter are not included in the record, it is unclear whether the disputed claims were for fees submitted under St. Michael's or First Hospital's name. Accordingly, the demand letter is evidence that United suspected St. Michael did not qualify to recover some of the fees it had submitted but not of the reason for United's suspicion. The letter was silent on that detail.
A reviewing court does not construe summary-judgment evidence in the movant's favor. KPMG , 988 S.W.2d at 748. United's letter, read alone and without the benefit of its attachments, does not establish the basis for United challenging St. Michael's fees. Thus, the letter does not conclusively establish that United knew or should have known of its injury in March 2011.
United's claim did not accrue in March 2011.
3. June 2011 *339 The next possible date that United's fraud cause of action could have accrued was June 2, 2011, when United obtained a copy of Aetna's nearly identical complaint against First Hospital and St. Michael. Aetna's complaint alleged that First Hospital and St. Michael's management agreement was a "sham" designed to allow St. Michael to recover facility fees without obtaining a state license. The complaint further alleged that First Hospital and St. Michael "stonewall[ed]" Aetna's requests to review the management agreement because allowing review would have exposed their fraudulent scheme.
United argues that knowledge of Aetna's suit and alleged injuries does not establish that United knew it too had suffered an injury, citing In re Beef Industry Antitrust Litigation , 600 F.2d 1148 (5th Cir. 1979), and other federal court cases. In BeefIndustry , the Fifth Circuit stated that the "filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice" of a claim, but the court declined to rule that it did so as a matter of law. Id. at 1171. To hold otherwise would "compel a person situated like these plaintiffs to file suit, on the pain of forfeiting his rights, regardless of whether his attorney believes that there is good ground to support it," and would run afoul of Federal Rule 11. Id. at 1171 (discussing Rule 11's requirement that attorney certify that claims are warranted by existing law or by non-frivolous argument for change in law) (quotation omitted); see FED. R. CIV. P. 11. "The mere filing of a similar lawsuit, without more, does not necessarily" provide the basis to make the necessary Rule 11 certification. Beef Industry , 600 F.2d at 1171. For a publicly filed lawsuit to provide inquiry notice as a matter of law, the summary-judgment movant must demonstrate conclusively that the plaintiff, "through the exercise of reasonable diligence, would have discovered adequate ground for filing suit." Id.
Relying on Beef Industry , United argues that First Hospital cannot establish as a matter of law that United's June 2011 knowledge of the Aetna suit caused its fraud claim to accrue because a scheme to defraud one insurer does not indicate that a similar scheme was underway against other insurers. United again points to Kearney's affidavit, which states, "In my experience, providers may be specific as to the type of programs that they defraud. If a provider defrauds some other healthcare benefit payor (e.g., Aetna, Cigna, Blue Cross Blue Shield), that does not necessarily mean that the provider has also defrauded United Healthcare." According to United, knowledge of Aetna's suit was knowledge of mere allegations without the "more" that Beef Industry required.
But as Beef Industry acknowledged, "in some circumstances," knowledge of another's suit can suffice to provide notice under the federal standard. Id. at 1171. This has occurred when the claims were the same, the defendants were the same, and the plaintiffs were similarly situated. See Breen v. Centex Corp. , 695 F.2d 907, 912-14 (5th Cir. 1983) (holding that summary judgment on limitations was proper against plaintiffs who knew of and had communicated regarding previously filed lawsuit against same defendant involving essentially same claims).
Aetna's allegations were nearly identical to United's and involved two of the same alleged tortfeasors. There was close proximity in time between when Aetna alleged First Hospital and St. Michael entered their "sham" arrangement and when United began receiving facility-fee charges for Off-site ERs. Plus, by the time United learned of Aetna's suit, United had already been provided a list of First Hospital's affiliated Off-site ERs, including St. Michael, which, like First Hospital, was a *340 named defendant in the Aetna suit. And United and Aetna were both health care insurers dealing with the same issue of facility-fee payments to Off-site ERs.
With these overlapping parties, factual assertions, and claims, we conclude that notice of Aetna's suit placed United on inquiry notice of its fraud claim against First Hospital and its affiliated Off-site ERs, meaning that United's fraud claim accrued, as a matter of law, on June 2, 2011, when, through the exercise of reasonable diligence, United could have discovered the facts giving rise to its claim.[19]
United's own actions support our conclusion. Six months after it downloaded a *341 copy of Aetna's complaint alleging a scheme between First Hospital and St. Michael, United hired counsel to inquire into First Hospital's contractual relationship with the Off-site ERs, including the one named in Aetna's suit. There is no indication in the record that United obtained any additional information about First Hospital's relationship with the Off-site ERs between June 2011 (when it obtained a copy of Aetna's complaint) and December 2011 (when it hired counsel to investigate). Having enough information to cause one to engage investigative counsel strongly suggests that the inquiry-notice standard has been met. See DeWolf , 452 S.W.3d at 392 (holding that discovery rule did not prevent limitations bar because, among other things, plaintiff knew enough "to protect her interests by hiring counsel" same year as underlying event, and citing Guccione v. United States , 670 F.Supp. 527, 536 (S.D.N.Y. 1987), and Kronisch v. United States , 150 F.3d 112, 121-22 (2d Cir. 1998) for proposition).
As a matter of law, United's fraud claim accrued on June 2, 2011 and, therefore, was set to expire on June 2, 2015 at the latest.[20] See Lewis v. AAA Flexible Pipe Cleaning Co., Inc. , No. 01-14-00229-CV, 2005 WL 375295, at *2 (Tex. App.-Houston [1st Dist.] Feb. 17, 2005, pet. denied) (mem. op.) (stating that claim with two-year limitations period will expire on exact same calendar date, two years later); Cortinas v. Wilson , 851 S.W.2d 324, 326 (Tex. App.-Dallas 1993, no writ) (same). United did not file suit until August 28, 2015, which was more than four years later. Thus, absent any other theory to extend limitations, United's claims are barred.
E. Any period of fraudulent concealment does not preclude dismissal of United's fraud claim on limitations
1. Applicable law on fraudulent concealment
Limitations can be extended when a defendant has fraudulently concealed its wrongful conduct from the plaintiff. Ross , 356 S.W.3d at 927 ; Kerlin v. Sauceda , 263 S.W.3d 920, 925 (Tex. 2008). Fraudulent concealment equitably tolls limitations "because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." S.V. , 933 S.W.2d at 6. It is unjust to allow a party "to avail himself of the protection of a limitations statute when by his own fraud he has prevented the other party from seeking redress within the period of limitations." Valdez v. Hollenbeck , 465 S.W.3d 217, 230 (Tex. 2015).
A plaintiff relying on this counter-defense must assert it and present evidence raising a fact issue on each of its elements. KPMG , 988 S.W.2d at 749. The elements of fraudulent concealment are (1) the existence of an underlying tort, (2) the defendant's knowledge of the tort, (3) the defendant's use of deception to conceal the tort, and (4) the plaintiff's reasonable reliance on the deception. See Davenport v. Adu-Lartey , 526 S.W.3d 544, 555 (Tex. App.-Houston [1st Dist.] 2017, pet. denied) ; Markwardt v. Texas Indus., Inc. , 325 S.W.3d 876, 895 (Tex. App.-Houston [14th Dist.] 2010, no pet.) ; see also BP Am. Prod. Co. v. Marshall , 342 S.W.3d 59, 67 (Tex. 2011) (doctrine requires that "defendant actually knew the plaintiff was in fact *342 wronged, and concealed that fact to deceive the plaintiff"). The deception to conceal can be through either a misrepresentation or silence in the face of a duty to speak.[21] See Shah v. Moss , 67 S.W.3d 836, 846 (Tex. 2001). Fraudulent concealment is fact specific. BP Am. Prod. , 342 S.W.3d at 67.
Even when established, though, fraudulent concealment does not extend the limitations period indefinitely. Etan Indus., Inc. v. Lehmann , 359 S.W.3d 620, 623 (Tex. 2011). And reasonable reliance on another's deception to conceal a tort is subject to the rule that the statute of limitations is tolled only until the fraud is discovered or could have been discovered with reasonable diligence. Davenport , 526 S.W.3d at 555 (noting that fraudulent concealment "ceases to toll limitations if a plaintiff purports to have relied on a misrepresentation or omission but was put on notice of the alleged harm by other means and a diligent inquiry could have led to the discovery of the truth"); see ExxonMobil Corp. v. Lazy R Ranch, LP , 511 S.W.3d 538, 545 n.21 (Tex. 2017) ("The doctrine of fraudulent concealment tolls the statute of limitations until the fraud is discovered or could have been discovered with due diligence.").
To avoid summary judgment on limitations grounds, a plaintiff seeking to avail itself of the fraudulent-concealment counter-defense has the burden to raise a fact issue on each of its elements. See Lazy R Ranch , 511 S.W.3d at 544 ; KPMG , 988 S.W.2d at 749 (stating that fraudulent concealment is affirmative defense to limitations and summary-judgment response must present "evidence raising a fact issue on each element of the fraudulent concealment defense"); Casey v. Methodist Hosp. , 907 S.W.2d 898, 903 (Tex. App.-Houston [1st Dist.] 1995, no writ) ("Once a defendant has conclusively established the affirmative defense of limitations, the burden rests with the plaintiff to come forth with proof that raises a fact issue regarding the elements of fraudulent concealment.").
A fact issue on fraudulent concealment exists, for example, when a plaintiff's investigation leads to evidence exonerating a potential defendant, the plaintiff does not sue that defendant by the limitations deadline, and the plaintiff later determines that the exonerating evidence was falsely provided by that potential defendant. See Cherry , 645 S.W.2d at 782 (reversing summary judgment on limitations due to fact issue on defendant's fraudulent concealment). In Cherry , workers were injured in a gas well explosion. Id. at 781. The workers' cause of action accrued when they were injured, and they timely sued various entities but not Victoria Equipment. While the limitations period was running, the workers deposed Victoria Equipment's owner, who testified that his company "had nothing to do with the well." Id. More than two years later, the workers discovered that the owner's assertions were false and added Victoria Equipment as a defendant in their suit. Id. Victoria Equipment successfully moved for summary judgment on limitations grounds. Id. The intermediate court affirmed, holding that the workers had not exercised reasonable diligence in discovering Victoria Equipment's true involvement. Id. But the Texas Supreme Court reversed, holding that a fact issue *343 existed on fraudulent concealment. Id. If Victoria Equipment's owner fraudulently concealed the company's wrongdoing, limitations would be tolled during the period that the workers reasonably relied on the false assertion, potentially precluding summary judgment. See id.
2. Any tolling afforded under a fraudulent-concealment theory would not be long enough to prevent United's claims from expiring
United's fraud claim accrued no later than June 2, 2011 when it learned of Aetna's suit. Later that year, United initiated an investigation, but there is no evidence of the specific investigative activities pursued between 2011 and 2014 or of what United discovered during those years. The next event discernible from the record is a letter from United to First Hospital dated May 23, 2014, in which United requested documentation of First Hospital's contractual relationship with and operation of the Off-site ERs.
In response to that letter, between June 30 and September 23, 2014, First Hospital conveyed information to United four times regarding its relationship with the Off-site ERs. In the first two communications, First Hospital stated that none of the Off-site ERs had any affiliation with First Hospital after 2012 and that, before 2012, the Off-site ERs were "organized in order to comply with the provider-based entity requirements of 42 C.F.R. § 413.65, by being organizationally, clinically and financially integrated with the Hospital." First Hospital repeatedly asserted that a review of attached DHHS approval letters "should satisfy" United's inquiry. First Hospital did not supply supporting internal or corporate documents.
In First Hospital's final communication, dated September 23, 2014, First Hospital acknowledged that United sought confirmation that the Off-site ERs met statutory requirements to collect facility fees and asserted that it had "provided that confirmation." First Hospital assured United that DHHS already had "confirmed that each location was fully integrated with the Hospital and met the [statute's] provider-based requirements." And it declared that the DHHS approval letters were "the most definite and legally significant proof possible" that First Hospital had met all necessary statutory requirements. Again, no internal or corporate documents were provided.
When faced with United's specific requests for documentation establishing that First Hospital "owned or operated" the Off-site ERs, First Hospital provided none. See TEX. HEALTH & SAFETY CODE § 254.052(8). It never provided documents regarding the Off-site ERs' ownership. It never provided documents reflecting its contractual relationship with the Off-site ERs. And it never provided documents establishing the administrative processes and degree of control asserted by First Hospital over the Off-site ERs. Instead, in its final 2014 letter, First Hospital refused to provide documentation to support its assertions and stated that the federal approval letters were enough. In other words, First Hospital's letters did not seek to establish compliance with state statutes, and Section 254.052(8) specifically, in support of its earlier billing for the Off-site ERs' services under its name; instead, it sought to rely on DHHS's earlier grant of federal provider-based status to the Off-site ERs, without offering any documents to support that federal designation.[22]
*344 To the extent this series of letters from June to September 2014 could extend the limitations period under a theory of fraudulent concealment, it could not do so past the date of the last letter-September 23, 2014. By that date, United was aware that Aetna had alleged that these same defendants had "stonewalled" it. It also was aware that First Street was refusing to provide any internal documents and, instead, relying on a federal determination that had been abandoned.[23] United could no longer reasonably rely on First Hospital's undocumented assurances and reasonably should have pursued its claims. Instead, it waited an additional nine months to contact its litigation counsel and more than two additional months to file suit.
We conclude, as a matter of law, that reliance on First Hospital's unsubstantiated assurances was no longer reasonable after September 23, 2014, when First Hospital refused United's requests for supporting documentation and communications ceased. See Lazy R Ranch , 511 S.W.3d at 544 ; Advent Trust Co. v. Hyder , 12 S.W.3d 534, 542 (Tex. App.-San Antonio 1999, pet. denied) (holding that, as matter of law, plaintiffs could not establish reasonable reliance because other information put them on notice). Accordingly, any tolling of the limitations period while First Hospital claimed compliance with applicable regulations for facility fees ended when First Hospital refused to provide copies of the supporting documents as United had requested.
Assuming without deciding that First Hospital's communications are capable of raising a fact issue on fraudulent concealment, the fact issue would require remand only if the resulting tolling could extend limitations to United's filing date. These communications from First Hospital began on June 30, 2014 and ended on September 23, 2014, an 85-day period, when First Hospital declined to provide documentary proof of its assertions. Tolling limitations for 85 days would not save United's claims because United did not file suit within 85 days of June 2, 2015, i.e., by no later than August 26, 2015. It filed suit on August 28, 2015.
Thus, even if the assertions in First Hospital's letters created a fact issue on whether First Hospital concealed any fraud, as a matter of law, United could no longer reasonably rely on First Street's assurances after September 23, 2014. Accordingly, the statute of limitations could not be tolled for a sufficiently long time to make United's suit timely. As such, even if we determined that fraudulent concealment applied on these facts, its application could not prevent summary judgment on limitations grounds.
F. United's argument that each bill has its own limitations period
In the breach-of-contract context, Texas treats separate unpaid invoices or bills as creating separate breach-of-contract claims, even when they all arise out of one contract, as, for example, when *345 fixed payments due under a promissory note are unpaid. Garden Ridge, L.P. v. Clear Lake Ctr., L.P. , 504 S.W.3d 428, 446 (Tex. App.-Houston [14th Dist.] 2016, no pet.) ; Discovery Grp., Inc. v. Kammen , No. 01-15-00243-CV, 2015 WL 7300690, at *3 (Tex. App.-Houston [1st Dist.] Nov. 19, 2015, pet. denied) (mem. op.); Precheck, Inc. v. Quik Check Records, Inc. , No. 01-13-00346-CV, 2014 WL 2933143, at *3 (Tex. App.-Houston [1st Dist.] June 26, 2014, no pet.) (mem. op.); Vermont Info. Processing, Inc. v. Montana Beverage Corp. , 227 S.W.3d 846, 855 (Tex. App.-El Paso 2007, no pet.).
United argues for similar treatment of its fraud claim, arguing that each bill[24] contained its own misrepresentation, each payment of a bill was a new legal injury, and thus, each bill had its own four-year limitations period.[25] But United provides no Texas authority applying a similar doctrine to fraud claims involving repeated invoices and payments.[26]
United, instead, relies on out-of-state fraud cases. Two of United's out-of-state fraud cases support its position. In a New York case, the government brought a common-law fraud claim against a Medicare provider for "ancillary claims" it submitted for payment for allegedly "non-covered pharmacy items." United States v. Erie Cty. Med. Ctr. , No. 02-CV-0305E(SR), 2002 WL 31655004, at *1 (W.D.N.Y. Oct. 30, 2002). The court held that the claims accrued "when the plaintiff suffered a loss, rather than when the fraud was allegedly committed," and because the "plaintiff suffered loss when it paid the allegedly false claims," the individual claims paid within the applicable number of years of filing suit were not time barred. Id. at *6. Also, a California case, Dolan v. CMTC , No. CV 12-08384-RGK (Ex), 2013 WL 12139355 (C.D. Cal. May 1, 2013), supports United's position to the extent the evidence might establish that First Hospital's bills contained allegedly false representations in support of a claimed right to facility fees, many of which were sent within four years of filing suit. In Dolan , the defendants hired a recruiting entity to bring in over 1,000 employees for a project that never materialized. Id. at *1. The recruiting company sued for fraud more than two years after the parties executed their services contract, and the defendants argued that the fraud claim had expired. Id. at *2. The court held that, because the defendants "repeatedly told plaintiffs" after initial accrual that the "project was definitely moving forward," the "continuing accrual rule"
*346 allowed accrual each time such a wrongful act occurred, thereby "triggering a new limitations period" and preventing the fraud claim from expiring before suit was filed. Id. at *1-2.
Turning to Texas authority, in Stafford v. Wilkinson , the Texas Supreme Court addressed the impact of sequential misrepresentations on limitations in a fraud case. 157 Tex. 483, 304 S.W.2d 364, 367 (1957). The Court held that any misrepresentations made after a fraud claim accrues that are "merely repetitions of the original representations" do not affect the accrual of a limitations period. Id. (noting that fraudulent statements made after claim accrued may support fraudulent-concealment defense even if they did not impact accrual date). Thus, when a defendant makes allegedly false statements in a writing, his subsequent false statements that are "the same as those previously made" do not give rise to "a new fraud claim." Odem v. Padgett, Stratemann & Co., L.L.P. , No. 04-11-00041-CV, 2011 WL 4090215, at *1 (Tex. App.-San Antonio Sept. 14, 2011, pet. denied) (mem. op.).
While Texas law is not well-developed on the issue, there is similar authority in other jurisdictions. See Quintana v. Wiener , 717 F.Supp. 77, 80 (S.D.N.Y. 1989) (stating that renter's fraud claim rested on rental documents and accrued with initial wrongful act and resulting damages and that subsequent rent payments increased damages without extending accrual date of fraud claim); Henry v. Bank of Am. , 147 A.D.3d 599, 48 N.Y.S.3d 67, 70 (2017) (holding, in case in which credit card company improperly enrolled plaintiff for products, fraud claim accrued with enrollment and initial fee payment because there was not "a series of independent, distinct wrongs," but, instead, "a single wrong that has continuing effects" as more monthly fees were charged); Landmar, LLC v. Wells Fargo Bank, N.A. , 978 F.Supp.2d 552, 562 (W.D.N.C. 2013) (holding that, under North Carolina law, fraud-based claims accrued with procurement of note and that limitations was not extended under continuing wrong doctrine because "monthly invoices, which plaintiffs consistently paid without protest" were simply "an ill effect of the original wrong" in procuring promissory note).
In a non-fraud case, another jurisdiction likewise has held that accrual occurs once all elements of a claim are met, even if damages continue. In Repay v. Bank of America, N.A. , a statute required a written authorization for debits from an accountholder's bank account. See No. 12 CV 10228, 2013 WL 6224641, at *2 (N.D. Ill. Nov. 27, 2013). The transferee did not get written authorization before beginning monthly debits. The plaintiff argued that each debit without a written authorization was a new statutory violation giving rise to a separate claim. Id. at *3. The court disagreed, holding that the statute only required written authorization to begin transfers and that the statutory claim accrued once the initial unauthorized transfer occurred. Id. at *4. Later transfers increased damages, but they did not alter or add to the elements of the claim to affect accrual. See id.
A similar issue was analyzed differently in Diviacchi v. Affinion Grp., Inc. , No. 14-10283-IT, 2015 WL 3631605 (D. Mass. Mar. 11, 2015), report and recommendation adopted , No. 14-CV-10283-IT, 2015 WL 3633522 (D. Mass. June 4, 2015). In that case, the accountholder signed "signature cards" that, unbeknownst to her, enrolled her in a bank program and led to fee charges that began five years later. Id. at *2-3. Years later, she sued her bank for violation of the same statute analyzed in Repay , asserting claims for breach of contract and fraud. Id. at *2.
*347 As to the statutory claim, the court rejected the Repay analysis, noting the statute's instruction that a cause of action should be brought "within one year from the date of the occurrence of the violation." Id. at *6 (quoting 15 U.S.C. § 1693m(g) ). The court held that each "recurring transfer causes a new injury" and that the plaintiff had a "complete and present cause of action" each time an unauthorized transfer occurred. Id. at *7. The court rejected the possibility that a "continuing violation" doctrine applied, holding instead that each transfer was a discrete violation of the statute, separately actionable. Id. at *9. Thus, the transfers that occurred more than the applicable number of years before the plaintiff filed suit were barred, but the more recent transfers survived limitations as separate, actionable violations. Id. at *10.[27]
Similarly, with her breach-of-contract claim, the court held that the bank customer's contract-based claims were, at least partially, within the limitations period because her contract was an installment contract, for which recurring obligations separately accrue with each payment. Id. at *15-16.[28]
The court analyzed her fraud claim differently. The court held that it accrued when "all of the elements for the cause of action" were "in place"-which was the first instance a false representation of material fact was made with knowledge of its falsity to induce her to act, she reasonably relied and acted on it, and damages resulted. Id. at *12-13. Thus, her claim accrued when she was defrauded into authorizing enrollment and first suffered damages, which was more than three years before she filed suit. Id. Later recurring fees were not additional fraudulent acts involving new "misrepresentations of material fact" but merely additional damages. Id. at *12-14.[29]
We find the distinction drawn in Diviacchi between when a fraud claim accrues compared to other types of claims convincing. The individual bills that United seeks to be given their own limitations periods under a fraud cause of action sought payment under the authority of First Hospital's earlier assurances to United that the Off-site ERs were entitled to facility fees due to the contractual relationship and level of ownership and control by First Hospital. There is no claim that the individual bills misrepresented the services provided to a particular patient on a particular date, included distinct misrepresentations, or were otherwise unique. The same type of injury occurred as a result of each invoice: payment of invoices for Off-site ERs that allegedly were not eligible for payment of facility fees because the relationship between First Hospital and the Off-site ERs was not as indicated. The separate bills are a form of continuing damages arising from one core alleged fraudulent misrepresentation: that First Hospital owned or operated the Off-site ERs and held federal provider-based status.[30]
*348 We conclude that the submission of bills under an earlier-represented claim of a legal right to recover facility-fee payments did not create separate fraud claims and had no effect on the accrual of United's fraud cause of action. Our holding is consistent with the analysis in a Dallas Court of Appeals decision, holding that a fraudulent billing claim was barred by limitations. See Sullivan v. Bickel & Brewer , 943 S.W.2d 477, 480 (Tex. App.-Dallas 1995, writ denied). There, a client sued his law firm for legal malpractice and fraud. He contended that the law firm submitted fraudulent bills and misrepresented the status of his litigation. Id. at 481-82. The appellate court concluded that the client's fraud claim had expired more than four years before he filed suit because it had been more than four years since he "received detailed monthly invoices and status reports" and discovered "several facts concerning his cases which he alleged [the law firm] concealed from him and used to draw out litigation." Id. at 483. Holding that the law firm conclusively established its affirmative limitations defense, the court stated, "While [the client] may not have known the full extent of his damages" more than four years before he filed suit, "he was aware of enough facts to apprise him of his right to seek a judicial remedy" against the law firm. Id. While the Sullivan opinion does not directly address whether individual bills were separate frauds with their own limitations periods, its holding implicitly treats an earlier event as providing the notice that allowed the single fraud claim to accrue, even though the billing continued.
In sum, the longest limitations period for United's tort claims is four years. Defendants established as a matter of law that notice of the Aetna suit on June 2, 2011 provided adequate information to United to put it on inquiry notice of its own claims and to require it to investigate and bring suit within four years. That is when United's fraud claim accrued and began the four-year limitations period for it to file suit, even though billing continued.[31] Because United did not file suit within four years of being put on inquiry notice, or even four years plus a tolling period for possible fraudulent concealment *349 through First Hospital's letters written between June and September 2014, the defendants were entitled to summary judgment on limitations grounds. The trial court did not err in granting summary judgment on that basis.
United's only claim to survive the limitations summary judgment was its claim for money had and received within two years of suit. United voluntarily nonsuited that claim.
Accordingly, no claims remain.
Conclusion
We affirm.

See, e.g. , Julie Appleby, More Emergency Rooms Open Away from Hospitals , USA Today (April 25, 2008), http://abcnews.go.com/Business/story?id=4721981; Edgar Walters, Freestanding ERs Find a Home in Wealthy Areas , The Texas Tribune (Aug. 21, 2015), https://www.texastribune.org/2015/08/21/freestanding-emergency-rooms-rise-texas/.

See Tex. Ins. Code §§ 843.002(24)(A), 1271.155, 1301.001, 1301.069, 1301.155 (discussing provision of emergency care and requirement of payment for emergency services); 28 Tex. Admin. Code §§ 21.2802(27), 11.2(b)(24) ; Tex. Health & Safety Code § 254.052(8)(B) (exempting from licensure requirement facilities owned or operated by hospital that is licensed or owned and operated by state and has been granted provider-based status by Centers for Medicare and Medicaid Services).

First Street Hospital LP, and related entities and individuals First Surgical Partners, LLC, First Surgical Partners Holding Inc., Anthony Rotondo, and Jacob Varon, M.D.

The Woodlands FEC, LLC, Emergency Healthcare Partners LP d/b/a Memorial Heights Emergency Center, and St. Michael's Emergency Center, LLC (along with related individuals, Brian Orsak and Shannon Orsak).

Diane Crumley, and related entities Vital Weight Control, Inc. and Harris County Title Search, Inc.

See Tex. Ins. Code. § 843.002(7) (defining "emergency care" to mean "health care services provided in a hospital emergency facility, freestanding emergency medical care facility, or comparable emergency facility to evaluate and stabilize medical conditions of a recent onset and severity....").
United disputes that Off-site ERs are entitled to facilities fees as comparable facilities. See 28 Tex. Admin. Code § 11.506 (b)(9)(F)(i) (defining "comparable facility" to include "Level V Trauma Facilities and Rural Health Clinics that have licensed or certified or both licensed and certified personnel and equipment to provide Advanced Cardiac Life Support consistent with American Heart Association and American Trauma Society standards of care and a free-standing emergency medical care facility as that term is defined in Insurance Code § 843.002," which is a facility licensed under Health and Safety Code Chapter 254).

According to United's discovery responses, which First Hospital attached as evidence to its summary-judgment motion, the average facility fee at issue in this litigation is $1,005 per claim.

These agreements were amended two months later, in August 2010.

It is unclear which version of management contract First Hospital claimed created a contractual relationship that would support describing the Off-site ERs as "wholly-owned" by First Hospital. Under the initial "Facilities Management Services Agreement," the Off-site ERs owned the facilities and First Hospital managed them. Under the later "Emergency Room Department Management Agreement," First Hospital leased the Off-site ERs' facilities, and the Off-site ERs managed them. Neither relationship suggests full ownership by First Hospital.

The letter did not include Woodlands FEC, though it appears from the record that it also was affiliated with First Hospital at the time.

See Pl. Complaint, Aetna Life Ins. Co. v. First Street Hospital, L.P. , No. 11CV01341 (S.D. Tex. dism'd April 7, 2011), 2011 WL 9172999. According to United, the Aetna suit "settled confidentially before the court issued any ruling on the merits of Aetna's allegations."

More specifically, United knew of the following Aetna allegations:
• The Department of Insurance's January 2006 letter stated that Off-site ERs were not entitled to facility fee payments;
• St. Michael entered into a "sham 'affiliation' agreement or 'under-arrangement' " with First Hospital to "circumvent Texas law" and collect facility fees;
• "First Street has been submitting to Aetna on behalf of St. Michael[ ]" facility-fee claims "using First Street's [tax identification number] as a 'front' " without any "substantive change to St. Michael's operations" because the affiliation was "a change in name only";
• "There is no legitimate business purpose or synergistic relationship supporting the affiliation agreement between First Street and St. Michael[ ]," in part because First Hospital "is not a full-service inpatient hospital to which St. Michael[ ] can readily transfer patients suffering from emergent conditions who require further emergency care or inpatient care. Rather, First Street is a small, 'boutique' hospital" with only five inpatient beds that "specializes in bariatric surgeries"; St. Michael was not a "facility licensed by" Texas;
• St. Michael was "not a hospital-based emergency room" but nevertheless "submitted facility fee charges" for payment by an insurer;
• St. Michael submitted claims "as if" it was providing "a hospital-based emergency room" service;
• St. Michael "masqueraded as a hospital emergency room"; and
• Both First Hospital and St. Michael "stonewalled and refused to provide" documentary evidence Aetna had requested to evaluate the contractual relationship between the two. They refused to provide copies of their contract, documentation from the Texas Department of State Health Services that might verify that First Hospital's license applied to St. Michael and permitted recovery of facility fees for care provided at St. Michael, as well as verify that St. Michael is "fully integrated into" First Hospital, as it claimed. Aetna contended that it had requested all these documents and First Hospital and St. Michael refused to produce them.

The record contains a DHHS letter for Memorial Heights and St. Michael, but not for Woodlands FEC.

On appeal, First Hospital and the Off-site ERs extend their argument to assert that DHHS's determination on provider-based entity status precluded insurers like United-and even the State of Texas-from independently examining whether these entities actually were owned or operated by a hospital.

United concedes that it decided not to "reinvent the wheel" when it included large portions of the Aetna complaint in its own petition against the defendants.

Analysis under the discovery rule's "should have known" standard is unnecessary, even in a fraud case, if there is conclusive evidence that the plaintiff had actual knowledge of "alleged wrongful actions and that those actions caused problems or injuries" to the plaintiff's interests. See Exxon Corp. v. Emerald Oil & Gas Co., L.C. , 348 S.W.3d 194, 203 (Tex. 2011). When a defrauded party has actual knowledge, the limitations clock begins, even if the plaintiff does not yet know "the specific cause of the injury; the party responsible for it; the full extent of it; or the chances of avoiding it." Id. at 207 (quoting PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship, 146 S.W.3d 79, 93-94 (Tex. 2004) (internal citations omitted) ).
In Emerald Oil , a royalty owner's letter that threatened to sue Exxon conclusively established "that the royalty owners knew or suspected there were problems or damages allegedly caused by Exxon to their interests" and, as a result, commenced the limitations period. Id. at 206. Notice "of the alleged harm or injury-causing actions" required the plaintiff to "exercise reasonable diligence to investigate the suspected harm" and file suit within the applicable limitations period. Id. at 207. Put differently, the limitations period began to run when the defrauded party was "on notice of injury-causing conduct" and reasonable diligence would have uncovered the wrong. Id. at 208 ; see Hooks v. Samson Lone Star, Ltd. P'ship , 457 S.W.3d 52, 58 (Tex. 2015) ; Shell Oil Co. v. Ross , 356 S.W.3d 924, 928 (Tex. 2011).

Via Net is an example of the narrowness of the discovery-rule exception to the statutes of limitations. See id. at 313 (stating that discovery rule only applies in "exceptional cases"); see also S.V. , 933 S.W.2d at 25 (noting that applications of discovery rule "should be few and narrowly drawn"); Syrian Am. Oil , 524 S.W.3d at 360 (describing discovery-rule exception as "purposefully narrow").

Moreover, to be entitled to summary judgment on limitations grounds, movants must establish when a legal injury was suffered. See Pasko , 544 S.W.3d at 834 ; S.V. , 933 S.W.2d at 4. Yet First Hospital points to no evidence that United suffered damages by July 2010.

United argues that a defendant seeking summary judgment on limitations must establish more than when, in a general sense, the plaintiff should have known the facts giving rise to its claim. According to United, the burden is more exacting: to establish what facts could have been uncovered in a diligent inquiry that would have supported initiating a lawsuit. Under United's argument, the accrual date cannot be any earlier than the date on which such an investigation would have revealed the relevant, identified facts.
In our view, the discovery rule as applied to this fraud claim is not so demanding. First, the "verified" facts argument United draws from federal case law is analogous to the "latent disease discovery rule" discussed in Childs , 974 S.W.2d at 43-44. For that type of injury claim, the Court amended the discovery rule to delay accrual until such time as a reasonably diligent plaintiff "uncovers some evidence of a causal connection between the injury and the plaintiff's occupation." Id. at 41. The Court recognized the public policy reasons for not using the standard discovery rule in that context. See id. at 43 (explaining public policy grounds for allowing latent-exposure claimants longer to bring suit). The expansion of the general discovery rule for latent-exposure cases in Childs is not consistent with United's argument that a "verified" facts standard applies in all discovery rule contexts, including this fraud suit.
Second, to the extent that the Texas Supreme Court has used language arguably supportive of United's position, the context of that language must be considered. See Berry-Helfand , 491 S.W.3d at 724. In Berry-Helfand , a defendant lost a jury trial then appealed the denial of its pretrial limitations motion. Id. at 709-10. The Court held that nothing in the record indicated an objective basis for inquiring into a possible claim at the point the defendant argued the plaintiff's claim had accrued. Id. at 724. Only after holding there was no inquiry notice did the Court note that the defendant had not identified any evidence of what a diligent investigation could have uncovered. See ids="6794717" index="119" url="https://cite.case.law/sw3d/491/699/#p724">id. at 724. But if there is no inquiry notice, the fruits of a hypothetical inquiry are not relevant to the accrual of a claim. By contrast, here, United was on inquiry notice because the Aetna suit provided objective information that reasonably should have-and did-cause United to investigate First Hospital's contractual relationships with the Off-site ERs and its statutory basis for billing facility fees.
In its suit, Aetna alleged that St. Michael began billing for facility fees in August 2009 under First Hospital's license number without any "change to St. Michael's operations." Whether St. Michael's operations changed when it began billing United under First Hospital's license was open to investigation. Aetna also alleged that First Hospital "is not a full-service inpatient hospital to which St. Michael[ ] can readily transfer patients suffering from emergent conditions who require further emergency care or inpatient care." Again, that is something that could have been investigated. To the extent First Hospital did not function as an inpatient facility, that would have given credence to Aetna's allegation that the relationship was other than as described. To provide another example, Aetna alleged that St. Michael "has never transferred a single patient" to First Hospital "for additional treatment or inpatient care." That allegation also could have been investigated, and, if true, would have supported Aetna's assertion that St. Michael was not operating as a department under the control and management of First Hospital.
These are examples of the information provided to United through Aetna's complaint. To the extent any of United's investigative efforts might have been stonewalled once they began, that raises an issue of fraudulent concealment, which is addressed separately.

United's tort claims with shorter limitations period expired earlier. We need not determine the applicable limitations period for each asserted tort claim because none had a limitations period longer than the four-year period for fraud.

First Hospital argues that the fraudulent-concealment doctrine cannot apply because it had no duty to disclose information to United. But fraudulent concealment can be based on something other than silence in the face of a duty to disclose; it can be based on an active misrepresentation. See Shah , 67 S.W.3d at 841 ; Cherry v. Victoria Equip. & Supply, Inc. , 645 S.W.2d 781, 782 (Tex. 1983). Whether First Hospital had a duty to disclose information is not determinative.

While the state statute requires that First Hospital "owned or operated" the Off-site ERs, the federal regulations require "ownership and control." Compare Tex. Health & Safety Code § 254.052(8) (emphasis added), with 42 C.F.R. 413.65.

The Off-site ERs were granted provider-based status in November 2011. By the next month, the Centers for Medicare and Medicaid Services (CMS) notified First Hospital that an onsite review had revealed that only 3% of its services were for inpatient care-the other 97% were for outpatient care, including at the six Off-site ERs. Because First Hospital did not "primarily engage[ ]" in inpatient services, CMS concluded that First Hospital did not qualify as a "hospital" and was not eligible for participation as a Medicare provider. First Hospital was given a month to demonstrate compliance with federal statutory requirements. One month later, in January 2012, First Hospital sought to bring itself within compliance by excising itself from the Off-site ERs. CMS agreed. Thereafter, First Hospital's contractual relationship with the Off-site ERs terminated.

According to United, there were nearly $4.5 million in facility-fee claims submitted by First Hospital and paid by United from late-August 2011 until its August 28, 2015 lawsuit.

In support, United relies on a criminal case, United States v. Hickman , 331 F.3d 439 (5th Cir. 2003), which states that health care providers owe a "new, independent obligation to be truthful" for each bill submitted to healthcare insurers. Id. at 447. But Hickman does not address when limitations commences in a civil case.

There may be policy reasons for adopting this rule for contract claims that do not exist for fraud claims. First, contractual obligations are determined by the parties. Second, unlike fraud claims, the limitations period for contract claims generally cannot be extended past four years based on the discovery rule, so an alternative means of extending limitations is unavailable. See Via Net , 211 S.W.3d at 315 (application of discovery rule to contract claims should be rare, "as diligent contracting parties should generally discover any breach during the relatively long four-year limitations period provided for such claims"). Third, contracts requiring performance longer than a year must be in writing, Tex. Bus. & Com. Code § 26.01(b)(6), so a significant extension of time for periodic payment obligations will open the door less widely to swearing matches as compared to fraud claims, which are often based on oral representations.

United has no analogous statutory claims in this suit.

Again, United has no analogous contract claim in this suit.

The court noted that the plaintiff had not argued that the discovery rule or theory of fraudulent concealment tolled limitation. Diviacchi v. Affinion Grp., Inc. , No. 14-10283-IT, 2015 WL 3631605, at *13 (D. Mass. Mar. 11, 2015), report and recommendation adopted , No. 14-CV-10283-IT, 2015 WL 3633522 (D. Mass. June 4, 2015).

United does not rely on the continuing tort doctrine. United does not argue that there is one continuous tort, but, instead, that each bill constitutes its own separate tort. Nevertheless, we find the Texas Supreme Court's reluctance to adopt the continuing tort doctrine instructive. See Exxon Mobil Corp. v. Rincones , 520 S.W.3d 572, 593 (Tex. 2017). The Court observed that the doctrine's extension of the accrual date "is rooted in a plaintiff's inability to know that the ongoing conduct is causing him injury." Id. at 592 ; see Taylor v. FDIC , 132 F.3d 753, 765 (D.C. Cir. 1997) (stating that continuing tort extends limitations because it "could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period"). But we have previously held that United had the ability to discover the alleged misconduct more than four years before filing this suit.

Much of United's argument uses an inverted approach to determine the operative dates for limitations periods. United filed suit on August 28, 2015. It seeks to count backward four years and recover all damages during those four years (versus determining when its claim accrued and counting forward four years to establish when its claim expired). Relying heavily on that framework, United argues that it could not have suffered a legal injury to begin the limitations period any earlier than four years before the date it filed suit because it is not seeking to recovery for any earlier harm. According to United, it could not have suffered a legal injury "before United even received and paid the fraudulent bills at issue " in this litigation. (Emphasis added.) United's argument ignores that it may have suffered a legal injury that began the limitations period more than four years before it filed suit, even if it is not seeking to recover damages for that or any other pre-August 28, 2011 injury. Limiting oneself to damages within four years of filing suit does not negate the need to establish an accrual date and determine whether suit was timely filed.