**Opinion issued July 27, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

## NO. 01-22-00247-CV

————————————

**BETTY RATHBUN LIGON, Appellant/Cross-Appellee**

**V.**

**JUDITH D. CASEY, Appellee/Cross-Appellant**

---

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-67737**

---

## MEMORANDUM OPINION

Appellant/cross-appellee, Betty Rathbun Ligon, challenges the trial court's judgment, entered after a jury trial, in the suit of appellee/cross-appellant, Judith D. Casey, against Ligon for breach of contract, breach of partnership agreement, breach of duty of care, quantum meruit, promissory estoppel, breach of fiduciary duty,

fraud, fraud by nondisclosure, and money had and received. In three issues, Ligon contends that the trial court erred in concluding that the statute of limitations did not bar Casey's damages claims.

In her sole issue on cross-appeal, Casey contends that the trial court erred in denying her motion to disregard certain jury findings.

We affirm.

## Background

Casey filed suit against Ligon on November 19, 2014. In her fourth amended petition, Casey alleged that "[f]rom around July of 2005 to August of 2013, [she] and Ligon were partners" in a company called MedPerm Permanent Placement, Inc., doing business as Therapy Consultants ("MedPerm").[1] According to Casey, MedPerm was a "medical placement firm" that recruited and placed speech therapists with various school districts. Because of school scheduling and contract needs, Casey and Ligon performed "[e]ssentially all" of their work in the spring and summer prior to the school year in which the speech pathologists began working under their contracts. Casey alleged that she and Ligon would "make their profits based on what they billed to the school districts for the hours worked" by the speech therapists. They "agreed to" a fifty-fifty "split" of MedPerm's net profits, which

---

[1] MedPerm was a defendant in Casey's suit but Casey's claims against MedPerm were dismissed before trial, and it is not a party to this appeal.

2

"were calculated by adding up the amount billed to the school districts for each therapist they placed and subtracting business expenses."

In August 2013, "without Casey's knowledge," Ligon sold MedPerm under a "Stock Purchase Agreement" to Robert and Rebecca Strobel (collectively, "the Strobels"). Before Ligon and the Strobels entered into the Stock Purchase Agreement, Ligon informed the Strobels "that her agreement with Casey was that most everything was split down the middle." (Internal quotations omitted.) The Strobels and Ligon then "spent two months" negotiating the sale to address the Strobels' "insistence on protection" from any possible claims by Casey "after the sale [of MedPerm] became final."

Casey further alleged that Ligon refused the Strobels' request to obtain a release from Casey or meet with her. When the Strobels were about to "walk[] away from the sale," Ligon offered to "warrant that Casey [wa]s not a partner and [wa]s not entitled to a percentage of" MedPerm's profits and "indemnify the Strobels if the warranty [wa]s breached." According to an email written by Ligon to the Strobels, Ligon believed that Casey would not "pursu[e] any partnership claims" because Casey "was 72 years old" and had "an ill husband."

The Strobels accepted Ligon's warranty and indemnification and paid Ligon $875,000.00 for MedPerm under the Stock Purchase Agreement. Ligon also received "the cash in MedPerm's accounts and the accounts receivable." According

3

to Casey, based on her partnership with Ligon, "as established through the[ir] course of dealings" for the previous eight years, she was "entitled to [fifty percent] of the proceeds from the sale, the cash, and the accounts receivable."

Further, Casey alleged that "[a]fter the sale" of MedPerm to the Strobels, MedPerm earned "at least $2,178,221 in revenue" during the "2013-2014 school year based on contracts secured by Casey"[2] in spring 2013. Yet, "MedPerm did not pay Casey" the share of "profits [that] she was entitled to."

Casey brought claims against Ligon for breach of common-law partnership and statutory partnership under the Texas Business Organizations Code. She alleged that she and Ligon had agreed that both "would work together in MedPerm and would split the profits equally." Further, they "had a community of interest in MedPerm" and "a mutual right to manage MedPerm." But Ligon "breached the partnership agreement by selling MedPerm without Casey's consent and retaining Casey's agreed share of [the] profits, cash[,] and accounts receivable [that] Ligon obtained through th[e] sale." And because "Ligon's calculation of anticipated expenses of MedPerm were not always accurate," Casey paid "more into MedPerm's operating account than was necessary." Because of Ligon's accounting errors, Casey did not receive her full share of net profits.

---

[2]    *See* TEX. BUS. ORGS. CODE ANN. § 152.052.

4

Casey also brought a claim against Ligon for breach of her fiduciary duty and a statutorily imposed duty of care[3] because Ligon "misrepresented the amount due to [MedPerm's] operating account each month"; "sold MedPerm without [her] permission"; "wound up the partnership without notifying [her]"; and "failed to split" MedPerm's "profits, . . . cash, and . . . accounts receivable" with her "after the sale." And Casey asserted a claim for fraud against Ligon, alleging that Ligon had falsely "represented to Casey that they were partners" in MedPerm and Casey was entitled to receive fifty percent "of the net profits." Further, during the eight years that Ligon and Casey had worked together, Ligon had falsely "represented to Casey" that she was receiving fifty percent of MedPerm's net profits. According to Casey, these misrepresentations were material because MedPerm "was Casey's livelihood for eight years, and she worked very hard toward growing MedPerm in order to receive her share of the profits." And Casey relied on Ligon's misrepresentations "by contributing to the business in the [s]pring and [s]ummer of 2013 to secure contracts on behalf of MedPerm."

Casey further alleged that Ligon's breach of their partnership, breaches of her duties of care and loyalty, and fraud "caused injury to Casey of between at least

---

[3] *See id.* § 152.206.

$576,685.00 and up to $1,000,000.00." Casey also requested attorney's fees, pre-judgment and post-judgment interest, and court costs.

Ligon answered, generally denying the allegations in Casey's petition. She also asserted that she and Casey had no partnership agreement, and Casey's claims were barred by the statute of limitations and the statute of frauds. And Ligon filed a counterclaim against Casey.

In her second amended original counterclaim, Ligon alleged that beginning in April 2005, she "was in the business of placing speech therapists . . . with various school districts." The speech therapists "were employees of Ligon," and the school districts paid her a "flat fee for each therapist [who was] placed with them."

Ligon operated her business "under the assumed name of Therapy Consultants." She "hired Casey as an independent contractor . . . to assist with Ligon's work and business." According to Ligon, "Casey's duties required her to identify and recruit" speech therapists and "obtain the necessary paperwork," including work visas, if needed, for those speech therapists. Casey also "perform[ed] general secretarial duties[] and sometimes monitor[ed] the working relationship between the school districts and [the] speech therapists." But "Casey was not allowed to sign any documents binding the company to any agreement" or "incur any obligations for the company."

6

In July 2005, Ligon formed MedPerm. Casey then "became an independent contractor for MedPerm, continuing [the] same work as before and being paid the same compensation by MedPerm."

According to Ligon, she sold one hundred percent of MedPerm's stock to the Strobels in August 2015. Under the Stock Purchase Agreement, Ligon agreed "to indemnify [the Strobels] for any third-party claim" involving MedPerm, "which accrued or occurred" before the closing date and which would have "include[ed] the [suit] brought by Casey."

Ligon alleged that beginning in January 2015, she "received communications" from the United States Department of Labor ("DOL") informing her that MedPerm owed the DOL funds due to a violation of work visa regulations involving MedPerm's former employees. "Casey had been handling correspondence" with the DOL and United States Citizenship and Immigration Services ("CIS") about those employees, "but she had no authority to bind MedPerm to any agreement or obligations." To "comply with her indemnity obligation" to the Strobels, Ligon paid DOL the funds due.

Ligon asserted that "Casey [had] breached her employment agreement with MedPerm by making decisions concerning" the employees who were working for MedPerm under MedPerm-sponsored work visas, representing to the DOL and CIS "that she was the owner of MedPerm" despite having "no ownership interest in

7

MedPerm," engaging in conduct "which resulted in MedPerm owing [the DOL] $16,000 or more," and concealing such conduct from Ligon.

Ligon also raised the affirmative defense of offset, asserting that if it was "determined that Casey and Ligon were partners in MedPerm," in order "to achieve a balance of partners' interests, she [was] entitled to receive from Casey" $321,963.00, which "represent[ed] the amount which Casey was paid in excess of monies paid to Ligon (excluding any distribution of profit during the time of Casey's employment)"; $33,229.00, which "represent[ed] one-half of the broker's commission incurred in the sale of the business"; about $137,420.00, which "represent[ed] 50% of the payments of principal on the Green Bank and Bank of America loans"; "the amount necessary to equalize the payment of federal income taxes on profit distributed to the parties"; about $2,500.00, which "represent[ed] [fifty percent] of the attorney's fees incurred by Ligon in negotiating and consummating the Stock Purchase Agreement"; "50% of all monies paid by Ligon under her indemnity obligation under the Stock Purchase Agreement, past and future"; "two-thirds (2/3) of the monies paid Casey as an independent contractor during 2011, 2012, and 2013 because Casey did not devote all of her working time to her duties for the business" despite receiving full compensation; "50% of all other expenses incurred in connection with the alleged partnership, including . . . interest paid to banks" and funds paid to certified public accountants and attorneys; and

8

about $121,834.00, which "represent[ed] 50% of the operating losses incurred by MedPerm in 2005, 2006, 2007 and 2008." Ligon also requested attorney's fees, pre-judgment and post-judgment interest, and court costs.

At trial, Casey testified that she met Ligon in the early 1990s. At the time, Casey worked for "a physical therapy company in Sugar Land," Texas, where she recruited speech therapists, physical therapists, and occupational therapists "for their clinics throughout Houston." Ligon spoke to Casey about a therapist who needed a short-term placement. After that, Casey and Ligon had "lunch together once or twice[] and kept up with each other."

Casey then went to work at another company at which she placed contract therapists in Houston-area clinics and hospitals. Those therapists included speech therapists, physical therapists, and occupational therapists. That company lost funding and went out of business in about 2000.

Following that job, Casey, at Ligon's suggestion, worked out of an office space that Ligon had rented with a former colleague to provide contract services with nurses. While there, Casey and Ligon worked together to place an occupational therapist with a school district in Alaska. Making that placement led them to realize that placing contract therapists with school districts presented a good business opportunity.

Ligon then suggested that they begin placing speech therapists in school districts because it was a "critical need" that they could meet. Casey and Ligon had conversations and exchanged numerous emails about what their business model would look like. They discussed a financial forecast of what the business could earn that Ligon had prepared. They also "talked about" the "rates to ask for in school districts," and Casey "had input" on the rates. And Casey negotiated the pay rate "with the first therapist" that she hired.

When Casey and Ligon "started out," Casey was "the lead recruiter," "getting people into [the] jobs." Casey had the authority to hire and did not need to consult with or get permission from Ligon before doing so. Casey also dealt "with the foreign-trained therapists," who required assistance in securing and maintaining the proper immigration status and finding temporary housing. Ligon was "the marketer," "out getting the school districts." They "both knew how to" recruit and market, and when necessary, Casey and Ligon "both did each job" and "work[ed] together." Ligon also kept "the books and records" for the business.

Ligon sought Casey's input on one of her first draft proposals for services to a school district, and in an email to a third party, Ligon referred to Casey as her "partner." Casey also would refer to herself as a "partner" in "fliers" that she sent "to school systems or to [job] candidates." Ligon would get a copy of the fliers and she never commented on the fact that Casey had called herself a partner. Further,

10

Casey signed contracts on behalf of MedPerm and "signed [Ligon's] name" with Ligon's "knowledge and permission." And Ligon told Casey to "[j]ust let [potential new employees] know" that Casey was "a partner" in the business.

According to Casey, her agreement with Ligon to split profits of MedPerm fifty-fifty was not in writing, but she considered the monthly reports that showed the revenues, billing, payroll, and profit and loss as proof of their agreement to do so. Casey understood that she would be receiving fifty percent of the profits of the business because of Ligon's "math on the reports."

Casey testified that she first learned that Ligon sold MedPerm when Ligon called her and told her, "well, I've sold the company." (Internal quotations omitted.) Ligon told her that "the new owners [would] want to work with [Casey]." Casey "was in shock." She was concerned that she "wasn't going to have any income" because she had "only a few months of reserve."

When Ligon sold MedPerm, Casey and Ligon "were having one of [their] largest years as far as starting with the large[st] number of speech therapists [placed] in school districts." At the time, they had about thirty speech therapists in schools around Houston and San Antonio.

After the sale, Casey hired a certified public accountant to review Ligon's accounts for MedPerm and found "that there w[ere] some discrepanc[ies]" between her agreement with Ligon to split profits evenly and what was in the accounts.

11

Susan Powell, a forensic accountant, testified that Casey asked her "to look at" MedPerm's financial records "in order to determine the loss of profits" for Casey's damages. She "looked at [the] tax returns for MedPerm from 2005 through 2012" and the 2013 tax return for the successor company after its sale. Powell also looked at the tax returns that Ligon had prepared for MedPerm, "the W-2s that MedPerm [had] provided" to Ligon, "the 1099 forms that MedPerm [had] provided" to Casey, Casey's tax returns, the monthly reports for MedPerm, and MedPerm's "profit and loss statements." In her opinion, "the business was operated as a partnership and for over eight years the profits of the business were shared 50-50."

Powell noted that there were many emails between Casey and Ligon "where [they] referred to each other as partners" and otherwise showed "that Casey participat[ed] in the business." From her review, she understood that "at the very beginning," Casey "looked at the business plan." Ligon asked Casey "a lot of questions," and Casey had "input in regard[] [to] who they would hire, what they would pay, how they would handle the expenses." Casey also discussed "insurance matters" and advertising with Ligon. And Casey entered "contracts with some of the school districts" and contracts with "marketing or trade show organizations in order to promote the business." According to Powell, Casey also "contributed . . . intellectual property, [consisting of] her skills and her experience" to MedPerm.

12

Powell further testified that in reviewing the documents that Casey had obtained from Ligon, she determined that Ligon had failed to adequately pay Casey for her share of the net profits before the sale of MedPerm. Powell determined that Ligon owed Casey $98,184.00 for underpayment of Casey's fifty-percent share of the profits before the sale of MedPerm.

Robert Strobel testified that he and his wife purchased MedPerm's stock from Ligon "at the beginning of the 2013-2014 school year." He paid Ligon $875,000.00 for MedPerm's stock. The stock purchase closing date was August 27, 2013. As part of the acquisition, Strobel was assigned the contracts that had been awarded by school districts for MedPerm to provide speech therapists for the 2013-2014 school year. Strobel did not pay Casey for her work in acquiring those contracts.

Ligon testified that in late 2004, she began discussions with Casey about how to create a staffing agency to place speech therapists in school districts. She "started asking Casey questions about things that she had done" previously in her career, "trying to get [Casey's] opinion about whether" such a staffing agency would have "a good profit margin" and "learn from [Casey] what she [knew] about" business "costs and expenses" because she knew Casey had experience with those things. Ligon also asked Casey "to go over" some "raw numbers" for the amount of pay that Ligon planned to offer to speech therapists and to give Ligon her thoughts about whether the numbers Ligon had proposed were realistic.

13

Ligon eventually drafted a proposed business plan and sent a copy to Casey along with an email in which she suggested that Casey should "feel free to tweak it." Ligon "valued [Casey's] opinion." But she did not discuss with Casey "a plan to form a business," just "a plan for [Casey] to work for the business."

In early 2005, Ligon asked Casey "if she would come to work for MedPerm and she said she wanted to." Casey "asked for" fifty percent of net profits, which was the same amount that Ligon "had been paying . . . other recruiters" she worked with at the time. Ligon confirmed that Casey did not need to submit an invoice or timesheet to Ligon to get paid, and there was no requirement that Casey generate a certain percentage of profits.

Casey told Ligon that "she wanted to come as an independent" contractor and asked "to be paid on [an IRS Form] 1099." "[Casey] had her own company, Milagro Staffing," and used her own email, telephone, desk, and office equipment. Ligon did not withhold any money for Casey's taxes, and Casey set her own work hours.

Ligon incorporated MedPerm in July 2005. She was listed as the sole shareholder on the articles of incorporation and was MedPerm's sole director. Ligon paid at least $1,000.00 for MedPerm's shares and paid money into MedPerm to be used as operating capital. When MedPerm did not have "enough money for payroll," she would withdraw her own savings to subsidize the company.

In the early years of the business, Ligon got an $80,000.00 home equity loan from Bank of America for MedPerm's benefit. To the extent that she did not withdraw profits from the business, those funds were kept "to cover payroll." Ligon never discussed MedPerm's cash flow problems with Casey because she was "the one" who Ligon was "trying to get money to pay." In September 2009, Ligon took out an additional loan of $185,000.00 for MedPerm. As with the first loan, Ligon repaid that loan with the profits earned by MedPerm.

In 2005, the first year of MedPerm's existence, the company had losses of $12,890.00. In 2006, it had losses of $113,100.45; in 2007, it had losses of $84,910.00; and in 2008, it had losses of $32,767.00. MedPerm then began to turn a profit. In 2009, it earned $116,366.00 in profits; in 2010, it earned $86,851 in profits; in 2011, it earned $120,307.00 in profits; and in 2012, the last full year before it was sold, MedPerm earned $34,058.00 in profits.

In 2007, Ligon "took a salary" from MedPerm but "didn't take any money as an officer" of MedPerm. Ligon took some money out of MedPerm as an officer in 2008. But in 2009 and 2010, Ligon did not take out much money because she "didn't have to pay [her]self," but she "had to pay" Casey, and she "was trying to have money in the bank to make payroll," make loan payments, and "grow the business."

According to Ligon, she and Casey never discussed having "any partnership," "[e]xcept" for a "working partnership." Ligon stated that she and Casey "talked

about being good working partners, getting the work out, doing that kind of thing." Ligon was okay with Casey telling people that she was Ligon's partner because Casey "said it was so much better with her recruiting when she said she was a partner rather than [a] recruiting specialist." Ligon acknowledged that she had sent an email referring to Casey as her "partner" and she had used "we" and "us" in discussing the business in emails to Casey.

When Ligon made accounting mistakes that affected the profit, she deducted the cost of the error before splitting the profit with Casey; they each still received the same portion of profit. While they were working together, Ligon "offered to show" Casey "the time sheets and the invoices so that she could look at them." Casey never asked to review those records. Ligon "never offered" Casey the opportunity to review "the profit and loss or balance sheets" or other "business records."

Additionally, Ligon explained that she had "hired [Casey] as a recruiter, but over time she did a lot more than recruiting, a lot more, such as getting quotes for advertising, or getting quotes for health insurance, or setting up the website." Ligon "would have [Casey] get quotes" for "advertising, insurances, convention booths, web hosting, that kind of thing." When MedPerm hired a speech therapist, Ligon had Casey take care of the paperwork, including "drug testing," "TB testing," and "fingerprinting."

16

Ligon also asked Casey to take care of the immigration issues for the foreign speech therapists. Ligon agreed that Casey did about ninety percent of the immigration work necessary for the noncitizen speech therapists. But she denied having seen documents filed with CIS and signed by Casey that listed both Casey and Ligon as owners. Ligon acknowledged that she had given Casey "permission to sign [Ligon's] name" on immigration applications "at least three times" in order "to expedite" them.

Ligon further explained that she was the only person authorized to sign checks on MedPerm's bank account. And over the eight years, Ligon gave Casey permission to sign "two or three or four checks." Most of them were for immigration matters. Ligon also gave Casey MedPerm's credit card number so she could enter contracts with marketing companies.

Ligon decided to sell MedPerm because Casey's "husband was ill and she had some problems," and Ligon "was working a lot" even though she was almost seventy years old. Her "children insisted" that she sell the business. As part of the sale, the Strobels wanted Ligon to guarantee that Casey would not take any of the speech therapists to work for her business. Ligon made that guarantee in the Stock Purchase Agreement.

Ligon told Casey about the sale of MedPerm to the Strobels "[t]he afternoon that it was completed." Ligon did not tell Casey about it beforehand because she

17

was afraid that Casey would tell the speech therapists that MedPerm employed, and Ligon did not want the therapists to know about the sale "because they [we]re what" Ligon was "selling." Ligon also considered the fact that Casey "had her own business" and "that some recruiters or people might try and steal [MedPerm's] employees to go to work for" another company. Ligon "wanted the new owner[s] to have a clean slate," and she "thought [they] would hire [Casey] part-time."

After Casey rested, Ligon moved for a directed verdict. Among other things, Ligon argued that the statute of limitations barred Casey's damages claim for fifty percent of MedPerm's profits because, in the exercise of "reasonable diligence," Casey "should have discovered" the "mistakes in the profit split going all the way back to 2005" before November 2010—four years before Casey filed suit. Casey responded, among other things, that because Ligon was "making an affirmative claim going back to [2005]," the statute of limitations did not apply. The trial court denied Ligon's motion for a directed verdict.

Peter Wilson, a certified public accountant, then testified that he had done "some work" for MedPerm in 2008, namely, preparing its "2007 tax return," "payroll tax forms," "end-of-year tax forms, W-2s, 1099s, and the corporate tax return." Wilson confirmed that MedPerm was a "Subchapter S" Texas corporation and Ligon was its sole owner. Casey "show[ed] up nowhere" on MedPerm's tax

18

returns. Wilson opined that Casey was not entitled to any portion of the proceeds from the sale of MedPerm because "[s]he wasn't an owner" of the business.

Wilson also testified that Ligon had to "maintain some cash in the business" to be able to pay MedPerm's employees and "continue to operate." And "Ligon had to pay tax on all [MedPerm's] income," even when "she saw no cash." MedPerm "made money," but "it never distributed anything to [Ligon]." There was "some cash in the business . . . at the end of 2010 or 2011" "[b]ecause [Ligon] had paid a whole slew of taxes on money that she had never seen." "[L]oan payments" also "need[ed] to come out of revenue."

From Wilson's perspective, "Casey was an independent contractor for MedPerm." He viewed Casey's own federal income tax return filings as supporting the conclusion that Casey was an independent contractor. Ligon would issue Casey an IRS Form 1099, "which would be appropriate for a person who was not an employee" or "an owner of the company." Casey filed forms showing that she was "paid a commission for her sales work" and "signed her tax return saying she was a sole proprietor" of her own company. If Casey were found to be Ligon's partner, Wilson believed that she "way underpaid her taxes." Casey "should have paid taxes on all of her income instead of deducting . . . expenses against what MedPerm paid her." She also "would have had to pay taxes" on MedPerm's net income "even though that wasn't part of her compensation."

19

After deliberating, relevant to this appeal, the jury found that:

- In response to Question No. 1, that Casey and Ligon had "agree[d] to create a partnership for the purpose of placing speech therapists in school districts" (the "agreement").

- In response to Question No. 2a, that Ligon had "fail[ed] to comply with" the agreement by failing to split MedPerm's profits "[fifty-fifty] [b]efore the [s]ale."

- In response to Question No. 2b, that Ligon did not fail to comply with the agreement by failing to split the proceeds from the sale of MedPerm.

- In response to Question No. 5, that Casey, in the exercise of reasonable diligence, should have discovered Ligon's breach of the agreement by not splitting MedPerm's profits fifty-fifty before the sale by August 1, 2007.

- In response to Question No. 6, that Casey and Ligon did not create a statutory partnership.

- In response to Question No. 8a, that $98,184.00 would be fair and reasonable compensation to Casey for Ligon's breach of the portion of the agreement that Casey receive a fifty percent share of profits before the sale of MedPerm.

- In response to Question No. 8b, that Casey was not entitled to fifty percent of the proceeds from the sale of MedPerm.

The jury also made findings as to the reasonableness and necessity of each party's attorney's fees.

Following trial, Ligon filed a motion for entry of judgment. Based on the jury's finding in response to Question No. 5 related to the statute of limitations, she proposed that the trial court render judgment for her and order that Casey take

20

nothing on her claims against Ligon. Casey filed a motion for judgment notwithstanding the verdict or in the alternative a motion to disregard certain jury findings, requesting that the trial court disregard the jury's limitations finding in response to Question No. 5 because her agreement with Ligon "called for periodic payments" and "a split of profits each month," and thus, she was entitled to damages for the four-year period preceding the date she filed suit. Casey also requested that the trial court disregard the jury's finding in response to Question No. 2b, in which the jury failed to find a breach in the failure to split proceeds from the sale of MedPerm, and the jury's finding in response to Question No. 8b, in which it failed to find any damages for a breach arising from the failure to split the sale proceeds. Casey asserted that there was no evidence that her and Ligon's agreement to split profits "was modified to exclude sales proceeds of the partnership assets."

In its final judgment, the trial court incorporated by reference "the questions submitted to the jury and the jury's findings." The trial court ordered that Casey recover from Ligon $98,184.00 in damages. The trial court also awarded Casey $185,000.00 in attorney's fees for representation in the trial court; $40,000.00 in attorney's fees for representation in the court of appeals; $17,500.00 in attorney's fees for representation at the petition for review stage in the Texas Supreme Court; $35,000.00 in attorney's fees for representation at the merits briefing stage in the Texas Supreme Court; and $7,500.00 in attorney's fees for representation through

21

oral argument and the completion of proceedings in the Texas Supreme Court. The trial court ordered that Ligon take nothing on her claims against Casey.

## Jury Findings

As an initial matter, we note that the parties' issues on appeal are premised on conflicting interpretations of the jury's findings. When we encounter a judgment that contains apparently conflicting provisions, we must resolve the conflict, if possible, and then review the parties' contentions about the judgment under the appropriate standard of review. *Point Lookout W., Inc. v. Whorton*, 742 S.W.2d 277, 278 (Tex. 1987). When reconciling jury findings, we apply a de novo standard of review. *Adams v. Allstate Cnty. Mut. Ins. Co.*, 199 S.W.3d 509, 512 (Tex. App.— Houston [1st Dist.] 2006, pet. denied); *see also Bender v. S. Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex. 1980). The threshold question is whether the jury findings address the same material fact. *Bender*, 600 S.W.2d at 260. We presume that the jurors did not intentionally make conflicting findings. *Trans-Am. Van Serv., Inc. v. Shirzad*, 596 S.W.2d 587, 593 (Tex. App.—Houston [1st Dist.] 1980, no writ). We must reconcile apparent conflicts in the jury's findings if reasonably possible in light of the pleadings and evidence, the manner of submission, and the other findings considered as a whole. *Bender*, 600 S.W.2d at 260; *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 695 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

The parties dispute the legal significance of the jury's findings about whether they had a partnership. In her fourth amended petition, Casey asserted claims for breach of both a common-law partnership and a statutory partnership under the Texas Business Organizations Code. In response to Questions Nos. 1 and 2, the jury found that Casey and Ligon agreed to create a partnership "for the purpose of placing speech therapists in school districts" and that Ligon failed to comply with the agreement by failing to split MedPerm's profits fifty-fifty before the sale but not by failing to split the proceeds from the sale of MedPerm. In response to Question No. 6, the jury found that Casey and Ligon did not create a statutory partnership.

The jury did not receive any instructions in either Question No. 1 or Question No. 2 as to the elements required to form a common-law partnership. In contrast, Question No. 6 provided the jury with the statutory definition of a general partnership and listed the factors "indicating that persons have created a partnership." *See* TEX. BUS. ORGS. CODE ANN. §§ 152.051(b), 152.052(a). Those factors include the person's:

(1)  receipt or right to receive a share of profits of the business;

(2)  expression of an intent to be partners in the business;

(3)  participation or right to participate in control of the business;

(4)  agreement to share or sharing:

(A)  losses of the business;  or

23

(B)  liability for claims by third parties against the business; and

(5)  agreement to contribute or contributing money or property to the business.

*Id.* § 152.052(a).  Unlike a common-law partnership, the Texas Business Organizations Code does not require proof of all five of these factors to establish the existence of a statutory partnership.  *See Ingram v. Deere*, 288 S.W.3d 886, 895–96 (Tex. 2009) ("The common law require[s] proof of all five factors [listed in section 152.052(a)] to establish the existence of a partnership.").  A statutory partnership arises from "a less formalistic and more practical approach to recognizing the formation of a partnership" than the common law.  *Id.* at 895.

Because the jury found that Casey and Ligon did not form a statutory partnership while considering the five factors contained in Texas Business Organizations Code section 152.052(a), it necessarily could not have found the existence of a common-law partnership, and in response to Question No. 2, it could not have found that Ligon failed to comply with a common-law partnership agreement, as this would have required an affirmative finding as to all five factors listed in the Texas Business Organizations Code.  *See* TEX. BUS. ORGS CODE ANN. § 152.052(a); *Ingram*, 288 S.W.3d at 895–96.  Nevertheless, we conclude that the jury's finding in response to Question No. 6 and its findings in response to Questions Nos. 1 and 2 do not address the same material fact.  *See Bender,* 600 S.W.2d at 260.  According to the jury's responses to Questions Nos. 1 and 2, Ligon and Casey had

24

an agreement to split MedPerm's profits fifty-fifty before the sale of MedPerm and Ligon breached that agreement by failing to do so (the "profit-sharing agreement"). Those findings do not support the existence of a common-law partnership, but they do support the breach-of-contract claim brought by Casey in her live pleading. *See Tex. A & M Concrete, LLC v. Brae Burn Constr. Co., Ltd., L.L.P.*, 651 S.W.3d 607, 617–18 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (breach-of-contract claim requires proof of (1) the existence of valid contract, (2) performance or tendered performance by plaintiff, (3) breach of contract by defendant, and (4) damages sustained by plaintiff as result of defendant's breach).[4]

Equipped with this understanding of the jury's findings, we consider the parties' issues on appeal.

---

[4] Because the jury did not find the existence of a partnership, the jury's findings in response to Question Nos. 7 and 15 that Ligon failed to comply with the duties of loyalty and care and the fiduciary duty that she would have owed Casey as a partner, do not affect our conclusion. Those questions explicitly presume the existence of a partnership yet were improperly predicated on either an affirmative breach-of-contract finding or an affirmative partnership finding. Because the jury did not find that a partnership existed, neither Ligon nor Casey owed any fiduciary duties to each other as partners. *See, e.g.*, *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 175–77 (Tex. 1997) (no evidence of partnership or other confidential relationship between parties that would give rise to fiduciary duty); *Brosseau v. Ranzau*, 81 S.W.3d 381, 398 (Tex. App.—Beaumont 2002, pet. denied) (plaintiff "had to prove the existence of the partnership agreement as a prerequisite to establishing the breach of fiduciary duty owed to a partner").

**Ligon's Appeal**

In her first issue, Ligon argues that the trial court erred in denying her motion for a directed verdict because the statute of limitations barred Casey's damages claim for failure to split the profits of MedPerm before it was sold. In her second issue, Ligon argues that the trial court erred when it disregarded the jury's finding in response to Question No. 5, which asked the jury to find the date by which Casey should have known that Ligon had breached their agreement, because "Casey failed to plead the continuing contract rule" and "she c[ould not] rely on it as an exception to the general rule that a breach of contract claim accrues when the breach occurs." In her third issue, Ligon argues that the trial court erred in awarding Casey her attorney's fees because Casey's claims were time barred. Because these issues all turn on the resolution of whether and how the statute of limitations applies to Casey's claim, we consider them together.

A trial court may direct a verdict in favor of a defendant when: (1) the plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery or (2) the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *see also* TEX. R. CIV. P. 268 (using "motion for instructed verdict" and "motion for directed verdict" interchangeably). A directed verdict is appropriate when reasonable minds can draw only one conclusion from

26

the evidence. *Smith v. Aqua–Flo, Inc.*, 23 S.W.3d 473, 476 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). We must "consider all of the evidence in a light most favorable to the party against whom the verdict was instructed and disregard all contrary evidence and inferences; we give the losing party the benefit of all reasonable inferences created by the evidence." *Szczepanik v. First S. Tr. Co.*, 883 S.W.2d 648, 649 (Tex. 1994).

As the party asserting the statute of limitations as an affirmative defense, Ligon, in her motion for directed verdict, bore the burden of conclusively establishing that Casey's claims were time-barred. *See KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999); *Nguyen v. Watts*, 605 S.W.3d 761, 782 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). A four-year statute of limitations applies to contract actions. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004. Thus, to satisfy Ligon's burden, the evidence must conclusively prove that Casey's breach-of-contract claim accrued more than four years before she filed suit. *See KPMG Peat Marwick*, 988 S.W.2d at 748; *see also Nguyen*, 605 S.W.3d at 782.

A cause of action accrues and the statute of limitations begins to run when (1) the allegedly wrongful act was committed and caused an injury or (2) when the facts come into existence that authorize a plaintiff to seek a judicial remedy. *Nguyen*, 605 S.W.3d at 782; *see also Gauthia v. Arnold & Itkin, LLP*, No. 01-19-00143-CV,

27

2020 WL 5552458, at *6 (Tex. App.—Houston [1st Dist.] Sept. 17, 2020, no pet.) (mem. op.). Determining an accrual date is a question of law. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003); *see also Gauthia*, 2020 WL 5552458, at *6.

A breach-of-contract claim accrues at the time of the breach. *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002). If the parties' agreement contemplates a continuing contract for performance, the limitations period usually does not commence until the contract is fully performed. *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

In contrast, Texas courts treat separate unpaid invoices or bills as creating separate breach-of-contract claims, even when they all arise out of one contract. *United Healthcare Servs., Inc. v. First St. Hosp., LP*, 570 S.W.3d 323, 344–45 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Thus, if the terms of an agreement call for periodic payments while the agreement is in force, a cause of action for such payments may arise at the end of each period, before the contract is completed, even if the initial breach occurred outside the limitations period. *Bierscheid v. JPMorgan Chase Bank*, 606 S.W.3d 493, 510 (Tex. App.—Houston [1st Dist.] 2020, pet. denied); *see Lyle v. Jane Guinn Revocable Tr.*, 365 S.W.3d 341, 355 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *Hollander v. Capon*, 853 S.W.2d 723, 726–27 (Tex. App.—Houston [1st Dist.] 1993, writ denied). Recovery of any payment

28

that was owed before the four-year limitations period, though, is barred. *See Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 787 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also Bierscheid*, 606 S.W.3d at 510.

In *Trelltex*, the Fourteenth Court of Appeals considered a claim for underpayment of commissions earned under a sales agreement which were "paid on the last day of the following month in which the commissions were earned." 494 S.W.3d at 787 (internal quotations omitted). The appellate court observed that although the commission "payments varied in amount, they were fixed in that the agreement required them to be made using a specified formula on particular dates." *Id.* at 788. Finding that the commission agreement was not a continuing contract, our sister court concluded that the plaintiff was not entitled to recover any purported underpayments that occurred more than four years before the date it filed suit. *See id.*

The profit-sharing agreement between Casey and Ligon closely resembles the commission contract at issue in *Trelltex*. Like the commission payments owed in *Trelltex*, the profit-sharing payments owed to Casey varied in amount but were fixed in that the agreement required them to be made monthly according to a specified calculation. *See id.* Because the profit-sharing agreement found by the jury called for periodic payments, some of which were owed within the limitations period, Ligon did not satisfy her burden to conclusively establish that the statute of

29

limitations wholly barred Casey's breach-of-contract claim based on the underpayments of profits due under the profit-sharing agreement that occurred within the limitations period.[5]

Ligon next asserts that Casey waived her argument that the agreement required periodic payments by failing to plead it. Ligon, though, cites no authority to support her assertion that such a pleading requirement exists, and the cases cited above make clear that the nature of the agreement itself, and not the parties' pleadings, determines how the statute of limitations applies to a breach-of-contract claim. *See Bierscheid*, 606 S.W.3d at 510; *Trelltex*, 494 S.W.3d at 787–88; *see also* TEX. R. APP. P. 38.1(i). Accordingly, we hold that the trial court did not err in denying Ligon's motion for directed verdict based on her statute of limitations defense.

---

[5]   To the extent that Ligon asserts, in her reply brief, that the damages found by the jury do not correspond to the four-year period for which she was entitled to seek recovery, Ligon waived any challenge to the sufficiency of the evidence supporting the jury's damages finding by failing to raise it as an issue in her appellant's brief. *See* TEX. R. APP. P. 38.1(f) ("The [appellant's] brief must state concisely all issues or points presented for review."). The Texas Rules of Appellate Procedure control the required contents and organization of an appellant's brief. *Walker v. Taub*, No. 01-20-00580-CV, 2022 WL 2309133, at *5 (Tex. App.—Houston [1st Dist.] June 28, 2022, no pet.) (mem. op.). To comply with Texas Rule of Appellate Procedure 38.1(f), an appellant must articulate the issue she is asking the appellate court to decide. *Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 896 (Tex. App.—Dallas 2010, no pet.). If the appellant does not, there is nothing for us to address. *See id.*

The same standard of review that applies to our review of the trial court's ruling on a motion for directed verdict also applies to our review of the trial court's ruling on a motion to disregard jury findings. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822–23 (Tex. 2005) (setting out standard for reviewing sufficiency challenges and holding "the test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review"); *see also* TEX. R. CIV. P. 301 (trial "court may render [a judgment notwithstanding the verdict] if a directed verdict would have been proper" and may "disregard any jury finding on a question that has no support in the evidence"). A trial court may also disregard a jury finding if the issue is immaterial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994); *Ruff v. Univ. of St. Thomas*, 582 S.W.3d 707, 711 (Tex. App.—Houston [1st Dist.] 2019, pet. denied); *Orr v. Broussard*, 565 S.W.3d 415, 422 (Tex. App.—Houston [14th Dist.] 2018, no pet.). An issue is immaterial if it has been rendered immaterial by other findings or if it should not have been submitted at all. *See Spencer*, 876 S.W.2d at 157; *Orr*, 565 S.W.3d at 422. Issues that should not be submitted include those that ask the jury to answer a question of law or apply the law to undisputed or conclusively established facts. *See W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 891 (Tex. 2020); *Orr*, 565 S.W.3d at 422.

31

Because the jury found that Ligon had failed to comply with the agreement with Casey, Casey was entitled to recover for any underpayment of periodic payments owed within the limitations period, even though the initial breach, as found by the jury in response to Question No. 5, occurred outside the limitations period. *See Bierscheid*, 606 S.W.3d at 510. The jury's answer to Question No. 5 is immaterial because the undisputed evidence establishes that there is no basis for deferring the date on which Casey's breach-of-contract claims accrued. In her testimony at trial, Casey acknowledged that Ligon sent her a "profit split report" every month and "offered the books" to Casey so that she could review them. Under these circumstances, the discovery rule does not apply. *See, e.g.*, *Nguyen v. Watts*, 605 S.W.3d 761, 782 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (discovery rule applies only where nature of injury is inherently undiscoverable). Further, in her appellee's brief, Casey does not assert that she is entitled to recover any underpayments that occurred more than four years before she filed suit in August 2014. For these reasons, we hold that the trial court did not err in disregarding the jury's finding in response to Question No. 5.

As to Ligon's assertion that the trial court erred in awarding Casey attorney's fees, we note that Casey sought recovery of her attorney's fees under Texas Civil Practice and Remedies Code chapter 38. A party is entitled to recover attorney's fees under Texas Civil Practice and Remedies Code section 38.001 if she (1) prevails

on a cause of action for which attorney's fees are recoverable and (2) recovers damages. *See Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009); *R3Build Constr. Servs., LLC v. Drayden*, No. 01-20-00144-CV, 2022 WL 3452436, at *13 (Tex. App.—Houston [1st Dist.] Aug. 18, 2022, no pet.) (mem. op.). A breach-of-contract claim is a cause of action for which attorney's fees are recoverable. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(b)(8). Because the trial court did not err in awarding Casey damages based on her breach-of-contract claim, Casey, as the prevailing party, was entitled to recover her reasonable and necessary attorney's fees. *See id.* Accordingly, we hold that the trial court did not err in awarding Casey attorney's fees.

We overrule Ligon's first, second, and third issues.

## Casey's Cross-Appeal

In her sole issue on cross-appeal, Casey argues that the trial court erred in denying her motion to disregard the jury's findings in response to Questions Nos. 2b and 8b because "[t]he jury found that there was an agreement to form a partnership and a fiduciary duty owed by Ligon to Casey" and "there was no evidence submitted that changed the relationship or status of the partnership between the time that they conducted the business and when the sale of the business occurred."[6]

---

[6] Casey also asserts that the trial court erred in denying her motion to disregard the jury's findings in response to Question No. 16 in which the jury found that Casey was entitled to $98,184.00 in compensation for the breach of fiduciary duty

33

In response to Question No. 2b, the jury found that Ligon did not breach the agreement by failing to split the proceeds from the sale of MedPerm with Casey. In response to Question No. 8b, the jury found that Casey was not entitled to compensation from Ligon in the amount of fifty percent of the proceeds from the sale of MedPerm.

The trial court may not disregard a jury's negative finding and substitute an affirmative finding unless the evidence conclusively establishes the affirmative finding. *Ginn v. NCI Bldg. Sys.*, Inc., 472 S.W.3d 802, 843 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Cullins v. Foster*, 171 S.W.3d 521, 537 (Tex. App.—Houston [14th Dist.] 2005, pet. denied); *see also* TEX. R. CIV. P. 301 (trial court may "disregard any jury finding on a question that has no support in the evidence").

We have already concluded that the jury's findings, when reconciled, do not support a finding establishing the existence of a common-law or a statutory partnership between Casey and Ligon—only an agreement to split the profits of the business. Further, as to whether Casey was otherwise entitled to share in the proceeds from the sale of MedPerm, we note the evidence at trial showed that Ligon invested in MedPerm in ways that Casey did not. Ligon purchased MedPerm's

committed by Ligon. But, as previously explained, because the jury did not find that a partnership existed, neither Ligon nor Casey owed any fiduciary duties to each other as partners. *See, e.g.*, *Swanson*, 959 S.W.2d at 175–77; *Brosseau*, 81 S.W.3d at 398. Thus, we hold that the trial court did not err in denying Casey's motion to disregard the jury's finding in response Question No. 16.

shares, took out personal loans to meet its financial obligations, and in order to grow the business, went without the distribution of profits earned by MedPerm that she could have taken as a shareholder. And Wilson testified that Ligon paid taxes "on all [MedPerm's] income," even when "she saw no cash."

Casey, on the other hand, did not invest money in MedPerm and was not involved in ensuring that MedPerm could pay its employees when there was a shortfall. Further, as Wilson observed, Casey's own federal income tax return filings supported the conclusion that Casey was an independent contractor and not a partner of Ligon. Because the evidence does not conclusively show that Casey was entitled to share in the proceeds from the sale of MedPerm, we hold that the trial court did not err in denying Casey's motion to disregard the jury's findings in response to Questions Nos. 2b and 8b. *See Ginn*, 472 S.W.3d at 843.

We overrule Casey's sole issue.

## Conclusion

We affirm the judgment of the trial court.


                                        Julie Countiss
                                        Justice

Panel consists of Justices Landau, Countiss, and Guerra.

35